DARLENE JEFFRES, APPELLEE, V. COUNTRYSIDE HOMES OF LINCOLN, INC., A NEBRASKA CORPORATION, APPELLANT.

333 N.W.2d 754

Filed April 21, 1983. No. 82-109.

Terrance A. Poppe of Hecht, Sweet, Alesio & Morrow, P.C., for appellant.

Douglas McArthur of McArthur, Lamb, Lyford, Gilmore & Janssen, for appellee.

BOSLAUGH, McCOWN, and HASTINGS, JJ., and BRODKEY, J., Retired, and RIST, D.J.

BRODKEY, J., Retired.

Countryside Homes of Lincoln, Inc., a Nebraska corporation, (hereinafter referred to as Countryside Homes), one of the defendants below, appeals to this court from a judgment rendered against it in the District Court of Lancaster County in favor of the plaintiff-appellee, Darlene Jeffres (hereinafter referred to as Darlene). In her brief on appeal Darlene states that her name was incorrectly spelled "Jeffries" in the original petition, but that the correct spelling of her surname is "Jeffres." Darlene brought this action to recover damages to her mobile home, which she alleged resulted from the negligent conduct of Countryside Homes while assisting a constable of the municipal court of Lincoln, Nebraska, acting pursuant to a writ of restitution, in the towing and removal of her mobile home from

premises restored to the Gaslight Mobile Home Park (hereinafter referred to as Gaslight), her previous landlord, which had previously obtained a judgment against her in a forcible entry and detainer trial in the municipal court of Lincoln, Nebraska.

After the filing of the negligence petition in the Lancaster County District Court, the constable, Harold Wiese, and the city of Lincoln were made additional parties defendant to the action, but these defendants were later dismissed by the court on motions for summary judgment filed by them. The dismissal of these additional defendants was not appealed from, and therefore the correctness of the District Court's order of dismissal, particularly its dismissal of the constable from the action, is not an issue in this appeal. The court's order of dismissal does not specifically state the basis or grounds for dismissing the constable, but it is fair to assume that it was based on the constable's claim of some type of governmental or quasi-judicial immunity, inasmuch as in his answer to the third-party complaint filed by Countryside Homes against him and the city of Lincoln, the constable alleges, among other things, "that at all times relevant hereto, this third party defendant acted in good faith and is immune from the claims asserted in the third party complaint." We add, in passing, that this is the only place in all the pleadings filed in the action where the word "immune" or "immunity" is mentioned.

Darlene's negligence action against Countryside Homes was tried to the court, pursuant to a waiver of jury, on August 12 and 13, 1981. The trial court entered its judgment on November 17, 1981, holding that Countryside Homes acted negligently when moving Darlene's mobile home, that its conduct was the proximate cause of damage to Darlene's mobile home, and that the damage to the mobile home was in the amount of $6,300, for which it entered judgment and costs in favor of Darlene and against

Countryside Homes. The trial judge was requested to make detailed findings of fact, and did so in his seven-page judgment order. Among such findings of fact is the following: "Wayne Matthes' [the manager of Countryside Homes] impression that Countryside Homes was not liable because defendant was assisting the Municipal Court constable in removing plaintiff's mobile home from the rental lot is a mistake as to what the law is and is not a legal defense in this case."

Following the overruling of its motion for a new trial, Countryside Homes then appealed to this court. In its brief on appeal appellant alleges as its assignments of error that the lower court erred (1) in not granting quasi-judicial immunity to appellant in its assistance of a court official executing a valid court order; (2) in failing to hold that where appellant acted in good faith in assisting a court official in his execution of a court order, it was immune from liability; (3) in finding appellant's conduct under the circumstances of this case constituted actionable negligence; (4) in its determination of the value of appellee's mobile home immediately before and immediately after it was moved by appellant, to wit, that said home had a market value of $7,200 immediately prior to its being moved by appellant, and a market value of $900 immediately after it was moved by appellant.

We have concluded after reading the record in this case that while some of the testimony and evidence contained therein is conflicting, there is sufficient evidence to sustain the detailed findings of fact by the trial court contained in its judgment order. The scope of review of this court is well set out in our opinion in *Burgess v. Curly Olney's, Inc.,* 198 Neb. 153, 156, 251 N.W.2d 888, 890 (1977), in which we held: " 'The judgment of a trial court in an action at law where a jury has been waived has the effect of a verdict of a jury and should not be set aside unless clearly wrong.

" 'In determining the sufficiency of the evidence to sustain the judgment, that evidence must be considered most favorably to the successful party and every controverted fact must be resolved in that party's favor and he is entitled to the benefit of any inferences reasonably deducible from it.' " In this case we conclude that the trial court was not clearly wrong in its conclusion that Countryside Homes and its employees were guilty of negligent acts in moving Darlene's mobile home and were not protected against liability for such acts and resulting damages by the doctrine of quasi-judicial immunity, as hereinafter discussed; but, on the other hand, we are of the opinion that the trial court erred in its determination of the amount of such damages suffered by the appellee, and we must therefore remand the case to the trial court only for the purpose of the determination of the amount of damages incurred by the appellee.

It appears from the record in this case that Darlene purchased the mobile home in question on June 27, 1975, under a contract reciting a consideration of $9,832.50, and had lived in said home with her children for a period of 4 years prior to eviction, said home being parked in a rental space in Gaslight at 501 West Butler in Lincoln, Nebraska. When she purchased the home the following items were included in the purchase price: one sofa, one chair, two lamps, one coffee table, two end tables, kitchen table and four chairs, refrigerator, stove, three beds, two chests, and two window air-conditioners. The record also reflects that on August 3, 1979, Gaslight commenced a forcible entry and detainer action against Darlene in the municipal court of Lincoln, seeking restitution of the premises occupied by Darlene at 501 West Butler, and obtained a judgment for restitution of the premises on August 20, 1979. Thereafter, a writ of restitution was issued on said judgment, commanding the constable of the municipal court to remove Darlene

from the premises in question, and said writ was placed in the hands of Constable Wiese for execution. Attempts by Darlene to find a new location for her home in other mobile home parks in Lincoln were unsuccessful. Therefore, on August 29, 1979, acting pursuant to the writ of restitution, Constable Wiese contacted the manager at Gaslight to obtain her assistance in removing Darlene's mobile home from the premises, as Constable Wiese was unable to move the home on his own but needed the assistance of a toter to do so. He testified that he told Judy Allison, the manager for Gaslight, that he could hire somebody, or Gaslight could make its own arrangements, which would "cut down the cost," but that, either way, Gaslight would bear the towing costs. He further testified that the manager advised him that she had the men and equipment available and that hiring someone else would not be necessary. Thereafter, someone from Gaslight's office contacted Countryside Homes and requested its services to remove the mobile home. Glen Bomberger, who did the maintenance and towing for Gaslight and who was also associated with Countryside Homes, and Richard Usher, who worked as a serviceman and driver for Countryside Homes, went to the Gaslight office and met Constable Wiese preparatory to removing the home at 501 West Butler, having previously moved another mobile home at a different address. Constable Wiese testified that the only instruction he gave Bomberger and Usher was with reference to where to park the trailer after they removed it, which was to be at First and Belmont Streets, and that he did not give Bomberger or Usher any instruction on how the move should be conducted, as he had no expertise in moving mobile homes and was not qualified to judge the proper procedure to be followed. He admitted, however, that he did not object to the manner in which the home was moved. Both Bomberger and Usher, however, had had considerable experience in moving mobile

homes. Constable Wiese saw Bomberger and Usher remove the skirting from around the mobile home, and stated that it appeared to be in good condition at that time and did not appear to be leaning or tilting.

In his findings of fact contained in his judgment order, the trial judge found: "Mr. Bomberger and Mr. Usher started to move said mobile home by towing it with the toter and had moved said mobile home only five to ten feet when two of the left back tires blew out. The mobile home was leaning to the left at this time and the defendant's employees kept moving it out to the street. The left side of the mobile home caught on a lamp pole which put two gouges in the siding of said mobile home. Plaintiff's mobile home was moved about a quarter of a block at which time defendant's employees stopped and replaced the blown out tires and the rims on the wheels with the blown out tires. Those rims had started to flatten out. The mobile home at this time was leaning to one side. Defendant's employees started towing said mobile home again and after traveling approximately three blocks, the two tires that had been replaced blew out. The trailer started to lean more to one side. Defendant's employees did not stop but continued to tow plaintiff's mobile home approximately two blocks further to the area of First and Belmont Streets. Plaintiff's mobile home was moved a total distance of approximately seven blocks.

"Mr. Bomberger and Mr. Usher who both had experience in moving mobile homes knew or should have known that moving said mobile home with no tire on one axle at the start of said move and then continuing on with the move after other tires had blown out as discussed above was likely to cause damage to said mobile home. They did not exercise ordinary and reasonable care in order to prevent damage to said mobile home when they towed plaintiff's mobile home in the manner discussed immediately above and failed to exercise ordinary and

reasonable care in towing plaintiff's mobile home into a lamp pole. The damage to said mobile home occurred during the move from the rental lot on West Butler Street to the area at First and Belmont Streets." The trial judge, in his order, also found: "Mr. Bomberger and Mr. Usher were acting at the time of said move within the scope of their employment with the defendant Countryside Homes of Lincoln, Inc. The negligence of the defendant's employees was the proximate cause of the damage to said mobile home. The defendant Countryside Homes of Lincoln, Inc., is liable for plaintiff's damages." The evidence in the record amply supports the findings of the trial court, and we conclude that Countryside Homes is liable and responsible for the negligent acts of its employees committed in the course of their employment which resulted in damage to the mobile home, unless, of course, Countryside Homes is excused from such liability under the doctrine of quasi-judicial immunity because of the fact that at the time of such damage its employees were assisting the constable of the municipal court acting under a writ of restitution issued by such court. In that respect Countryside Homes argues that any quasi-judicial immunity extended to court officials in their execution of a valid court order also extends to those persons who, of necessity, assist those court officials, and that where the person assisting a court official in the execution of a court order has acted in good faith pursuant to the command of the court official, he is protected from liability. We shall now discuss those issues and defer discussion of the question of the amount of damages awarded Darlene by the trial judge.

As previously stated, Constable Wiese and the city of Lincoln were dismissed from the action before trial, on their respective motions for summary judgment, and are not involved in this appeal. The reasons for such dismissal are not stated or set out in the court's order of dismissal but were presumably

on the basis of the constable's judicial or quasi-judicial immunity, although not clearly so, as the third-party petition filed in the action also alleges grounds and acts of negligence against the constable. In any event it is clear that there has been no finding or judgment by the court with reference to any negligence on the part of the constable in removing the mobile home from its parking place in Gaslight. However, even assuming for the sake of argument, which we do not admit to be factually correct, that the constable by his actions at that time did commit negligent acts contributing to the injury to the trailer home, we now discuss what the liability of the constable might have been, particularly whether he is protected from liability under the doctrine of quasi-judicial immunity or, on the other hand, is still responsible for his negligent acts in the performance of the duties and authority contained in the writ of restitution; and, further, whether such immunity, if any, should be extended to Countryside Homes, the third party, which assisted him in towing the trailer, or whether such third party should, in any event, be liable for its own independent acts of negligence in towing such trailer.

The general rule with reference to the immunity of public officers from tort liability is set out in Restatement (Second) of Torts § 895D at 411 (1979), as follows: "(1) Except as provided in this Section a public officer is not immune from tort liability. (2) A public officer acting within the general scope of his authority is immune from tort liability for an act or omission involving the exercise of a judicial or legislative function. (3) A public officer acting within the general scope of his authority is not subject to tort liability for an administrative act or omission if (a) he is immune because engaged in the exercise of a discretionary function, (b) he is privileged and does not exceed or abuse the privilege, or (c) his conduct was not tortious be-

cause he was not negligent in the performance of his responsibility." The comments to the above section are enlightening, and we quote certain pertinent statements contained therein, as follows: *"b. Discretionary functions.* The complex process of the administration of government requires that officers and employees be charged with the duty of making decisions, either of law or of fact, and of acting in accordance with their determinations. It has traditionally been explained by the courts that public officers and employees would be unduly hampered, deterred and intimidated in the discharge of their duties, and as a result undesirable shackles would be imposed upon agencies of government, if those who act improperly or even exceed the authority given them were not protected in some reasonable degree by being relieved from private liability. The basis of the immunity has been not so much a desire to protect an erring officer as it has been a recognition of the need of preserving independence of action without deterrence or intimidation by the fear of personal liability and vexatious suits. . . .

*"c. Judicial or legislative functions.* A judge of a court of general jurisdiction or a legislator is given an immunity that is general in character. He is not liable for his discretionary acts or omissions even though he is found to have acted with malicious or other improper motives. . . .

"The immunity may extend beyond judges and legislators. It may apply, for example, to a prosecuting attorney or to a clerk of court or to a legislative official. This immunity existing for these officers, however, usually may not extend to improper motive.

. . . .

*"d. Administrative functions.* A high-level executive officer is usually accorded the same type of immunity as that given the judge and for the same reasons. He, too, must feel free to act in his discre-

tionary decisions as he sees fit, without being subject to influence by the threat of a harassing suit. . . .
. . . .
"e. *Immunity, privilege, nonnegligent conduct.*
A preliminary set of distinctions must be drawn, however, before the factors can be properly identified and described. The cases have usually gone on the assumption that if the function in which the officer is engaged is characterized as discretionary, an immunity from tort liability applies and he is not liable. The problem is not so simple. Courts speak of immunity in many types of situations. Thus the existence of an 'immunity' may mean that, so long as an officer acts within the general scope of his authority (see Comment *g*), he is not liable, regardless of his motives and whether he tried to exercise his judgment in good faith or not. . . . This is a full immunity—a true immunity—though it is sometimes called an absolute privilege.

"In a second situation, the existence of the 'immunity' may be treated as meaning that the officer is not liable if he made his determination and took the action that harmed the other party in good faith, in an honest effort to do what he thought the exigencies before him required. . . . If the action against the officer is for an intentional tort in which the officer knows that he is imposing the harm on the other party or is substantially certain to do so, this could properly be called a privilege. But if the action is for negligence, for acting or failing to act, thus creating an unreasonable risk of harm, it would be called an immunity. There are no privileges in a negligence action, since the issues involved are treated in the issue of whether the conduct was negligent. For this reason it seems appropriate to treat the defense as an immunity in both situations. It is a limited immunity, but it is as broad as good faith.

"In a third situation, the existence of 'immunity' may mean that the officer is not liable if his determination to take or not to take the action was rea-

sonable. . . . In an action for negligence, the question of whether the officer acted reasonably is actually one of whether he was negligent or not. The standard of what a reasonably prudent person would do under like circumstances applies. . . . This means that, like the doctor or lawyer, he is held to a higher degree of skill and knowledge and training and expertise, but also that he may be given substantially wider discretion in the exercise of that knowledge and expertise and that he may be held not liable for a 'mere error of judgment.'. . .

"The final situation is one in which the officer is liable unless he was correct in his determination. . . . If the action is for negligence, the conduct is of a kind for which no particular expertise or training is required or in which there has been substituted for the general standard of reasonableness a specific rule of conduct, as in negligence per se. Here, obviously, it is inappropriate to speak of tort immunity.

. . . .

"*f. Factors in determining what is a discretionary function and its consequences.* It should thus be apparent that in a tort action against a public officer the court has the responsibility of determining not only whether he was engaged in exercising a discretionary function but also, if he is, how extensively this circumstance should work in his defense. There is no single test. Attempts to solve the problem by setting forth a precise definition of the term, discretionary function, have been less than helpful. The expression is not only a standard (see Comment *d*); it is also a legal conclusion whose purport is only somewhat incidentally related to the definitions of the two words composing it. . . .

. . . .

"*g. Scope of official authority.* An immunity protects an officer only to the extent that he is acting in the general scope of his official authority. When he goes entirely beyond it and does an act that is not permitted at all by that duty, he is not acting in his

capacity as a public officer or employee and he has no more immunity than a private citizen. . . .

. . . .

"*h. Ministerial acts.* If an act of the official involves less in the way of personal decision or judgment or the matter for which judgment is required has little bearing of importance upon the validity of the act, there is no immunity or privilege. These acts are commonly called 'ministerial,' or sometimes 'operational.' The distinction is always one of degree. Ministerial acts are those done by officers and employees who are required to carry out the orders of others or to administer the law with little choice as to when, where, how or under what circumstances their acts are to be done. Examples of acts held to be ministerial under ordinary circumstances are the preparation of ballots, the registration of voters, the recording of documents and filing of papers, the care of prisoners, the driving of vehicles, the repair of highways, the collection of taxes, the taking of acknowledgments and the dipping of sheep. Yet under particular fact circumstances each of them may be held to involve the exercise of discretionary decision.

"*i. Legislative modifications.* The scope of an officer's liability in tort may be broadened or restricted by legislative action. Two federal statutes illustrate this. [The two acts referred to are the Civil Rights Act and the Federal Tort Claims Act.]

. . . .

"*j. Relationship of public officer's tort immunity to that of the government.* As a general rule, the immunity of a public officer is coterminous with that of his government. But this is not necessarily true. . . ." *Id.* at 412-19.

We now examine the pronouncements of this court with reference to the problem under consideration. At the outset we wish to point out that, apparently, Nebraska law does not agree with the statement in the Restatement with reference to the immunity af-

forded to an official in the performance of ministerial acts. The Restatement's position is that where the judgment or discretion required has little bearing of importance upon the validity of the act, there is no immunity or privilege. In the early Nebraska case of *Atwood v. Atwater,* 43 Neb. 147, 151, 61 N.W. 574, 575 (1895), this court stated: "It is a familiar rule to the bench and the profession, and one of great antiquity, that a judicial officer, whether of a court of limited or general jurisdiction, is not liable in a civil action for acts performed in his judicial capacity, if he has acquired and does not exceed the jurisdiction conferred by law. He is not liable in damages for mere error of judgment while acting within his jurisdiction, but he is not protected if he assumes to act beyond the scope of his authority." In the same case at 154-55, 61 N.W. at 576, this court cited from the Michigan case of *Wall v. Trumbull,* 16 Mich. 228 (1867), as follows: " 'A ministerial officer has a line of conduct marked out for him, and has nothing to do but follow it; and he must be held liable for any failure to do so which results in the injury of another. A judicial officer, on the other hand, has certain powers confided to him to be exercised according to his judgment or discretion; and the law would be oppressive which should compel him in every case to decide correctly at his peril. . . .' "

In the opinion this court also stated at 155-56, 61 N.W. at 576-77: "The remaining question is as to the liability of the marshal for serving the warrant and imprisoning the plaintiff in accordance with the command of the mittimus to him directed by the police judge. Both writs were regular on their face, and the court, or judge, had the jurisdiction to issue the same. This being so, the marshal was protected by the processes for everything he did thereunder within the line of his official duty. But he would be liable for any unnecessary abuse of the plaintiff, or if he exceeded his authority and acted oppressively

in the execution of the writs. The principle is well recognized by the authorities that a ministerial officer, acting under a process regular and valid on its face issuing from a court or tribunal with apparent jurisdiction to issue the same, is protected in obeying it."

The same rule was enunciated by this court in the case of *Koepf v. County of York*, 198 Neb. 67, 251 N.W.2d 866 (1977), in which we held that a ministerial officer, acting under a process regular and valid on its face issuing from a court or tribunal with apparent jurisdiction to issue the same, is protected in obeying it. In that case, which was an action brought under the Political Subdivisions Tort Claims Act, we stated at 72, 251 N.W.2d at 870: "We hold that the Political Subdivisions Tort Claims Act does not extend liability to a subdivision of this state for alleged negligent action of the county attorney in the filing of juvenile petitions.

"Similar and equally convincing arguments exist that the sheriff is also immune. A ministerial officer, acting under a process regular and valid on its face issuing from a court or tribunal with apparent jurisdiction to issue the same, is protected in obeying it. See Atwood v. Atwater, 43 Neb. 147, 61 N.W. 574 (1895). The sheriff's act was ministerial in character. He is immune from liability for carrying out those acts. The county of York, of which the sheriff is an officer, is likewise immune for the same reasons set forth above."

Under the facts of this case as set out in the record, it seems clear that the constable was acting ministerially in executing the writ of assistance issued by the court in the forcible entry and detainer action and that under the rules above stated would have been entitled to claim immunity for his acts legitimately and properly performed in doing so. Would the doctrine of quasi-judicial immunity have protected the constable in this case, even assuming that it had been determined that he was guilty of

negligent acts? We think not. The issue in this case is not the propriety or validity of the court's order but, rather, the manner in which the order was enforced. In her action Darlene does not complain of a "ministerial act," but is requesting redress for the negligent acts of Countryside Homes only. We do not believe the doctrine of judicial immunity is relevant or should be applied in this case. The law is well established that sheriffs and constables are not relieved from liability for acts of negligence, but are bound by the same rule of negligence that a civilian is bound by under like circumstances. 80 C.J.S. *Sheriffs and Constables* § 52, n. 42 at 228 (1953). In 70 Am. Jur. 2d *Sheriffs, Police, and Constables* § 69 at 180-81 (1973), it is stated: "A peace officer may be held liable for negligent or wrongful acts causing damage to property. If an officer, in executing a writ of restitution or possession, wantonly or carelessly and roughly handling chattel property injures it, he is liable for the damage caused. On the other hand, a sheriff is not liable for minor items of breakage caused by the eviction of a tenant, where negligence is not shown, even though the plaintiff's title fails and the landlord may be liable." Likewise, in § 74 of the same treatise, at 184, the rule is stated: "It is a well-settled rule that where an officer takes property by virtue of a writ, and subsequently, through want of proper care or diligence, allows it to be injured, wasted, or lost, or diverted to some other purpose, he is liable for the resulting injury." The following cases from other jurisdictions are similar to the facts of the instant case and support the above rule. In *Snyder v. Hart*, 78 F.2d 237 (D.C. Cir. 1935), it was held that a U.S. marshal, who executed a writ of restitution in the absence of the tenant and with knowledge that the tenant had not received notice of eviction and with 8 days remaining in which to execute the writ, was liable to the tenant for damages for negligently removing household goods onto the sidewalk at a time at which damage by rain was

actually occurring or reasonably to be expected. Likewise, in *Johnson v. Nelson,* 146 Wash. 500, 263 P. 949 (1928), the court held that the sheriff who had, pursuant to a writ of restitution fair on its face, evicted the tenants from the property upon their refusal to deliver possession was not liable to such tenants for breakage of household goods during such eviction, in the absence of evidence of such removal having been accomplished in a negligent manner. And in *The State ex rel. Carroll v. Devitt,* 107 Mo. 573, 17 S.W. 900 (1891), the court held that a writ of possession, though regular on its face, did not relieve the officer executing it from liability for carelessly breaking the tenant's furniture in putting the landlord in possession, the court stating at 576, 17 S.W. at 901: "But notwithstanding the writ of possession was fair and regular on its face, yet this does not and could not authorize the constable, or those acting under his orders, to do as Mrs. Lizzie Buda testified they did do, to-wit, 'handled the furniture very carelessly and roughly and broke some of it.' No writ, however valid or regular on its face, will sanction anything of this sort. An officer who misuses property in such a way as stated becomes a trespasser *ab initio*, and his writ affords him no protection. Cooley on Torts [2 Ed.] 541." In *Luddy v. The People*, 219 Ill. 413, 415-16, 76 N.E. 581 (1905), the court stated: "As a ground of reversal it is contended that plaintiff in error should be protected because he was a duly elected, authorized and acting constable; that the execution was regular upon its face; that he was merely doing his duty; that he had no legal notice of Mrs. Kimball's ownership of the goods until after the sale; also that the evidence does not sustain the verdict. There can be no doubt but that a constable acting in good faith under a writ regular upon its face will be protected in a *reasonable and lawful* performance of his duty, and if that were the only question presented in this case it would be easy of solution. But the fact that a man is

a constable and holds a writ regular on its face does not authorize him to do illegal and unlawful acts under the cloak of such authority. The mere fact that he is an officer should be a sufficient guaranty that he will act lawfully and that people who have to deal with him will be protected in their rights. If he steps over the bounds of his duty and arbitrarily and unlawfully does things which he is prohibited from doing, it is all the more reason why he should be punished for his illegal acts." (Emphasis supplied.) Nebraska case law is to the same effect. In *Brock v. Hopkins*, 5 Neb. 231 (1876), this court held that the clerk of a district court is a ministerial officer and is liable for damages obtained by his "negligently and carelessly" taking insufficient security, but that if he exercises a reasonable degree of care in the performance of his duty, he is not liable, even if the security should prove insufficient. The case of *Kopplekom v. Huffman*, 12 Neb. 95, 10 N.W. 577 (1881), involved a shooting by the sheriff of a prisoner who the sheriff contended was really an escaped prisoner. In that case the court gave a number of instructions, including the following: That if the jury found that Kopplekom shot and broke the plaintiff's leg, and at the time of doing so " 'had a writ of mittimus for the custody of the escaped prisoner Clark, but that he had no other process for the arrest of the plaintiff; that the defendant Kopplekom did arrest and take the plaintiff into his custody, as such sheriff, and against the wish and consent of the plaintiff; that the plaintiff broke loose from the arrest and custody of the defendant Kopplekom, to effect his escape therefrom; that the shooting and injury was done to prevent the plaintiff from escaping, and freeing himself from said arrest and custody; that the defendant mistook the plaintiff for the escaped prisoner Clark. Yet if the jury further find that said defendant Kopplekom might by the exercise of due care and diligence have ascertained that the plaintiff was not said Clark, then the

jury will find for the plaintiff.' " *Id.* at 101, 10 N.W. at 578. The appellate court approved the instruction as correct, and stated at 101, 10 N.W. at 578-79: "Under the pleadings the real question in issue was simply whether in what he did in and about the arrest, and attempted detention, of the defendant in error, he was wanting in that reasonable care and caution which is due to the safety and rights of the innocent. That question was properly presented to the jury by the charge, and we see no reasonable ground of complaint in anything that the court did." In *Shull v. Barton*, 56 Neb. 716, 77 N.W. 132 (1898), this court held that the fact that an officer acts in good faith in approving a replevin bond will not itself protect him from liability for negligence in the premises; and that if he negligently approves a replevin bond signed by insolvent or insufficient sureties, and damages result, he is liable. In *Gilbert v. Rothe*, 106 Neb. 549, 184 N.W. 119 (1921), it was held that a sheriff who levies on the property of a wife under an execution against her husband is liable for resulting damages. And, finally, in *Nash v. City of North Platte*, 198 Neb. 623, 255 N.W.2d 52 (1977), which was an action under the Political Subdivisions Tort Claims Act, based on the failure of the city of North Platte to protect plaintiff's motorcycle which had been detained by the police, this court held that the Political Subdivisions Tort Claims Act, although specifically excluding from its provision any claim arising in respect to the detention of goods or merchandise by any law enforcement officer, does not and was not intended to bar actions based upon the negligent destruction, injury, or loss of goods in the possession of a political subdivision.

From the overwhelming weight of authority cited above, both in Nebraska and nationally, we conclude that although the doctrine of quasi-judicial immunity might protect an officer who is acting under a writ from the court from his actions thereunder, so far as they relate to the question of jurisdiction or

propriety of such actions, or basic policy decisions, it does not protect such official from negligent acts in the performance thereof. As we have heretofore stated, we do not pass upon the correctness of the trial judge's decision, if any, regarding the negligence of the constable in this case, as there is nothing before us as to that issue; but we merely point out that even if Countryside Homes were to be considered an official of the city of Lincoln (which we do not decide) because of its assistance to the constable in towing the mobile home in question, it seems clear that it, too, would be liable for its own negligent acts in so doing.

Appellant in its brief has cited only three cases in support of its contention that the protection of a writ extends not only to the official executing it but also to all persons who assist him at his request. The first of such cases is *Dahl v. Halverson,* 178 Minn. 174, 226 N.W. 405 (1929). That case involved an action by the constable of the municipal court in Fergus Falls who called to his assistance individuals for the purpose of repossessing a piano. Of necessity, they broke a door and took the piano by force. The court in such case did state the rule as above cited. We have Shepardized the above case and find that it has not since been cited elsewhere again. Appellant also cites the case of *Wholesale Elec. v. Robusky,* 22 Ohio St. 2d 181, 258 N.E.2d 432 (1970), in which the Supreme Court of Ohio held that where a writ of possession was valid on its face, the sheriff, his deputy, and moving company and its president acting under the sheriff in removing personal property from the structure were immune from liability for any want of jurisdiction or other defect in proceedings culminating in issuance of the writ. This case obviously dealt with the question of jurisdiction and the validity of the writ in question, which distinguishes it from the facts of the instant case. The only other case discussing the issue before us, and which case is also cited by appellant in its brief, is

*Reinecke v. Sheehy*, 47 Mich. App. 250, 260, 209 N.W.2d 460, 465 (1973), in which case the court stated: "This immunity extends to those rightfully aiding an officer. 80 CJS, Sheriffs and Constables, § 122, pp 331-332." In its opinion the Michigan court also stated at 259, 209 N.W.2d at 465: "Ordinarily, of course, a judgment or order of a court having apparent jurisdiction, if valid on its face completely protects a sheriff or constable from liability *for any proper or necessary act done in its execution*, even if the judgment or order is otherwise void." (Emphasis supplied.)

Notwithstanding the above cases, we decline to adopt a rule endorsing self-help on the part of landlords or their agents and removing responsibility for any damage caused by the negligence of the officers evicting tenants, and of those who assist them. As stated by appellee in her brief at 19: "[S]uch a proposition would invite chaos."

Our conclusion, therefore, is that the trial judge was not clearly wrong, but in effect was correct in his decision that the appellant was not protected by the doctrine of quasi-judicial immunity. That part of his judgment is correct and will be affirmed.

However, our review of the record has convinced us that the testimony presented with reference to the amount of damages to the mobile home in question leaves much to be desired, and that issue should be remanded for rehearing in the court below. For example, the evidence is clear that when appellee purchased the motor home in question it contained a substantial amount of furniture. The record is also clear that appellee removed all of such furniture before the home was sold at sheriff's sale, and there is no evidence in the record as to the value of the items removed. If these items had any value at all (and they undoubtedly did), the appellant should be given credit for such value, rather than having the damages determined by the application of the price at the sale of $900 only.

We therefore remand this case for further hearing below, limited to the question of damages only, and otherwise affirm the judgment of liability against the appellant.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED FOR FURTHER PROCEEDINGS.