JOHN A. KREIKEMEIER, APPELLEE, V. J. PAUL MCINTOSH AND GERALD KRATOCHVIL, DOING BUSINESS AS ROGERS ELEVATOR CO., APPELLANTS.

391 N.W.2d 563

Filed August 1, 1986.    No. 85-380.

Lawrence H. Yost of Yost, Schafersman, Yost, Lamme & Hillis, P.C., for appellants.

Donn K. Bieber of Otradovsky & Bieber, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

GRANT, J.

John A. Kreikemeier, plaintiff-appellee, brought this action against the defendants-appellants, J. Paul McIntosh and Gerald Kratochvil, doing business as Rogers Elevator Co. Kreikemeier sought recovery of commissions due him on a written contract with defendants. The case was tried to the court in the district court for Colfax County, Nebraska. The trial court found generally for Kreikemeier and entered a judgment in his favor and against the defendants in the amount of $9,047.47. The defendants timely appealed to this court. For the reasons stated hereinafter we affirm.

The record shows the following. In August of 1977 Kreikemeier was employed as the manager of the Rogers Elevator Co. in Rogers, Nebraska, and continued as manager until he was discharged by defendants on July 29, 1983. At the time Kreikemeier began his employment, Rogers Elevator Co. was a Nebraska corporation. The corporation was dissolved for nonpayment of taxes on August 2, 1979. Defendants continued business thereafter under the same name. In the operations of the elevator company, defendants were engaged in the business of buying, selling, and storing commercial feed grains.

As manager, Kreikemeier was given a great deal of latitude by the defendants in running the day-to-day operations of the elevator. Kreikemeier testified that he had the authority to hire additional employees when needed, sign checks alone, order equipment, make repairs, and pay monthly bills. Kreikemeier could purchase any quantity of grain for the elevator and also could make grain sales in any amount. Kreikemeier's compensation consisted of a base pay with commissions. The commissions were based on a percentage of the elevator's net profit at its fiscal year end. Before 1983 the commissions were paid each year to Kreikemeier without a written agreement.

On July 29, 1983, Kreikemeier was terminated as the manager of the elevator. On August 2, 1983, Kreikemeier entered into a written agreement with McIntosh and Kratochvil.

A typewritten agreement was prepared by Kreikemeier's attorney. This agreement, with the bracketed words deleted at the time of the meeting of Kreikemeier and defendants, provided:

### AGREEMENT

This agreement entered into this _____ day of August, 1983 between John A. Kreikemeier, first party, and Rogers Elevator Co., second party.

IT IS AGREED:

1. First party shall continue to work for second party until August 31, 1983 and render reasonable assistance in assuring the smooth transition of management of the second party. First party shall be paid the same [hourly] salary as he was most recently paid [plus commissions as follows]:

2. Second party shall, on or before [September 1], 1983, pay to first party accrued commissions to [June 30], 1983, [in the amount of $8960.06 plus commissions due for the month of July, 1983.] [July] commissions shall be computed at the rate previously agreed upon for the current fiscal year.

_____          Rogers Elevator Co.
John A. Kreikemeier

        by: _____
           President

Kreikemeier presented this document to defendants. No attorneys were present at this meeting. The phrases in brackets were deleted by defendants. The deletions were agreed to by Kreikemeier. Defendant McIntosh changed the September 1 and June 30 dates to November 15 and August 31, respectively, and added the following two sentences after paragraph 2, in his handwriting: "This agreement is based on the assumption that an audit does not reveal mismanagement of grains and funds. If discrepancies are found, the bonus will be adjusted accordingly."

The parties each signed the modified agreement. Kreikemeier then wrote on the agreement the percentage

figures, "10% - 25000.00, 15% - next 25,000.00, 20% - over 50,000.00." There is apparently no disagreement that Kreikemeier's commission, or bonus, was calculated on the net profit the elevator showed at the end of the fiscal year, at the rates shown on the August 2, 1983, agreement.

The commissions were never paid, and Kreikemeier instituted this lawsuit on May 10, 1984. As previously stated, the district court found for Kreikemeier and entered a judgment in his favor for $9,047.47.

Defendants' statement of income and expenses for the year ending August 31, 1983, showed substantial sales, with a gross income of $255,986 and a net income of $68,654. The agreed-upon commission rate, applied to this net profit figure, does not coincide with the amount of judgment entered, but the difference is not the object of any dispute between the parties.

Defendants' addition to the contract adds two provisions to the contract presented by Kreikemeier: (1) Defendants conditioned the entire commission agreement "on the assumption that an audit does not reveal mismanagement of grains and funds"; and (2) Defendants specifically provided that if "discrepancies" were found, Kreikemeier's commission would be "adjusted accordingly."

Defendants' sole assignment of error is that "[t]he Trial Court's finding that the Plaintiff [Kreikemeier] had not mismanaged grain and funds is clearly wrong." Defendants do not complain that the commissions were improperly "adjusted accordingly" and do not appeal from the amount of the judgment entered, but from any judgment in favor of Kreikemeier.

Insofar as defendants contend in their brief at 6 that Kreikemeier's commission, or bonus, should be "reduced dollar for dollar with any loss shown as a result of mismanagement," we do not reach that point, because we determine that the audit did not "reveal mismanagement of grains and funds."

In its judgment the trial court found "generally for the plaintiff and against the defendants." Since this case involves a suit on a contract, where a jury trial has been waived, the judgment of the trial court has the effect of a verdict of a jury and should not be set aside unless clearly wrong. *Jeffres v.*

*Countryside Homes*, 214 Neb. 104, 333 N.W.2d 754 (1983). In determining the sufficiency of the evidence to sustain a judgment, that evidence must be considered most favorably to the successful party and every controverted fact must be resolved in that party's favor, and he is entitled to the benefit of any inferences reasonably deducible from it. *Jeffres v. Countryside Homes, supra.*

The phrase on which defendants rely to preclude Kreikemeier from obtaining any commission or bonus—"an audit does not reveal mismanagement"—was placed in the contract by defendants. Our law is settled that a contract will be construed most strongly against the party preparing it when there is a question as to its meaning. *Sacher v. Taco Grande of Iowa, Inc.*, 210 Neb. 122, 313 N.W.2d 257 (1981). A modification to a contract will be construed in the same way.

Similarly, in construing a contract, words must be given their plain and ordinary meaning as reasonable persons would understand them. *Rees v. Huffman*, 222 Neb. 493, 384 N.W.2d 631 (1986).

"Mismanagement" is defined in Webster's Third New International Dictionary, Unabridged 1444 (1981), as "corrupt or improper management." "Management," in turn, is "the conducting or supervising of something (as a business)." *Id.* at 1372.

In this case the primary complaint made by defendants against Kreikemeier's management was that Kreikemeier has not followed defendants' directions not to have further business dealings with Ron Tuma, a former partner of defendants. Kreikemeier testified he had not received such directions until after he had made payments to Tuma for future delivery of grain which was not delivered. Kreikemeier further testified that his course of dealings with Tuma was within the ordinary manner in which he conducted the operations of the elevator. The trial court, in finding generally in favor of Kreikemeier, apparently found that Kreikemeier's actions in this business did not constitute mismanagement.

On the Tuma transactions, the elevator suffered a loss of approximately $30,000. This amount was reflected in the audit in the bad-debt figure of $33,195.46 shown in the operating

expenses. In view of the fact that the audit showed that the sales of the elevator during the year in question exceeded $3,700,000, and the Tuma losses were approximately $30,000, we cannot say that the trial court erred in its determination in that regard. Apparently, Kreikemeier's management overall was not shown to be "mismanagement."

It is true that the defendants presented evidence indicating that Kreikemeier had paid his wife $800 for services rendered to the elevator and that he had transacted business with his father and brother. Kreikemeier fully explained the transactions in his testimony. None of the transactions were shown to be outside of the usual business operations of the elevator, and none were shown to have reduced the elevator's profits in any way.

It is also true that defendants produced evidence as to a limited number of instances in which Kreikemeier's probity might be questioned, but, again, no loss of the elevator's profits was shown, and, indeed, some of the transactions which defendants questioned could have resulted in greater gain for the elevator.

There was ample evidence to support the trial court's judgment in favor of plaintiff. The judgment is affirmed.

AFFIRMED.