**FIRST AMERICAN BANK,**
**N.A., Appellant,**

**v.**

**DISTRICT OF COLUMBIA and**
**Transportation Management,**
**Inc., Appellees.**

**No. 86–741.**

District of Columbia Court of Appeals.

Argued July 13, 1989.

Decided Dec. 11, 1990.

---

John M. Clifford, with whom Henry A. McKinnon, Washington, D.C., was on the brief, for appellant.

James C. McKay, Jr., with whom Frederick D. Cooke, Jr., Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellee District of Columbia.

Ronald K. Jaicks, Fairfax, Va., for appellee Transp. Management, Inc.

Before FERREN, BELSON and FARRELL, Associate Judges.

BELSON, Associate Judge:

This case arises from the unexplained disappearance of a bank dispatch bag from a vehicle owned by First American Bank after the vehicle had been towed to an impoundment lot because it was parked illegally in a rush hour zone. The main issue on appeal is whether the bank can recover from the District of Columbia and the towing company on a showing of failure to exercise ordinary care. We hold that it can.

The facts, as found by the trial court after trial without jury, are not in dispute. Appellant First American Bank employed Ronald Armstead as a courier whose duties included making deliveries between the bank's various branch offices and the main office. One afternoon, at approximately 4:20, Armstead parked the bank's station wagon near the entrance of Branch 13 on 7th Street, N.W., in violation of "No Parking Rush Hour Zone" signs, which were in clear view of Armstead. Four locked bank dispatch bags, marked as such, which Armstead had just picked up from four different branches, were in the rear luggage compartment of the station wagon and in

plain view of anyone looking into the vehicle. The dispatch bags contained checks and other valuable documents.

Armstead had received tickets for illegal parking at this particular spot on at least five prior occasions and had been warned against future violations by traffic enforcement personnel. Traffic enforcement personnel had counseled Armstead to park across the street during rush hour to avoid being ticketed or towed. Armstead, who had received numerous parking tickets during his employment with the bank, would simply give the parking tickets to a supervisor for payment. The bank did not reprimand or discipline Armstead, nor did it dock his pay, for the parking tickets.

Within a short time after Armstead entered Branch 13, a parking control aide approached the bank's station wagon and began writing up a ticket for illegal parking. Almost immediately thereafter, a tow truck owned by Transportation Management, Inc. (TMI) arrived at the scene. While the parking control aide was completing the ticket and the tow truck operator was simultaneously preparing to tow the car, one of the employees at Branch 13 alerted Armstead that the bank's vehicle was being towed. Armstead, carrying a dispatch bag, ran out to the vehicle and told the tow truck operator that, as the driver of the vehicle, he was prepared to drive the vehicle away immediately. When the tow truck operator ignored his request to return the vehicle, Armstead asked that he be allowed at least to remove the dispatch bags from the vehicle. The tow truck operator, however, also ignored this latter request, and instead entered the truck and began to drive away with the bank's vehicle in tow. The crane form filled out by the tow truck operator indicated that the doors, trunk, and window of the bank's station wagon were locked when it was towed from 7th Street. When the tow truck operator arrived at the Brentwood impoundment lot at 4:45 p.m., the dispatch bags were still inside the luggage compartment of the vehicle. The tow truck operator observed the District's lot attendant test all the doors and the rear gate of the vehicle. The lot attendant found them all locked and so certified on the same crane form.

One and a half hours later, the bank's supervisor of mailroom couriers paid for the vehicle's release and retrieved it from the impoundment lot. The bank supervisor found the driver's door unlocked and one dispatch bag missing. There were no signs of forced entry, nor were there signs of the tape which is customarily affixed to car doors at the impoundment lot. The dispatch bag was never found, nor have the police identified or apprehended anyone who may have removed it from the vehicle. The value of the checks and other papers contained in the dispatch bag was determined to be $107,561. First American was able to recoup $57,616.71 of its loss,[1] but asserts that the cost of its recoupment effort was $10,555.[2] First American brought suit against the District of Columbia and TMI for breach of bailment and for conversion of its property.

The trial court ruled that the District and TMI were gratuitous bailees and therefore liable only for gross negligence. The trial court further ruled that First American did not meet its burden of proving that the District and TMI were grossly negligent, and that even if the defendants had been grossly negligent, First American was precluded from recovering because it was both contributorily negligent and assumed the risk. As for the claim of conversion, the trial court ruled that there was no conversion because the initial seizure of the vehicle was lawful. We affirm the disposition of the claim of conversion, but reverse on the bailment issue.

 There is no dispute here that TMI and the District had sufficient possession and control of the bank's vehicle to establish a type of bailment. *See Bernstein v.*

---

1. First American was able to reduce its loss by such means as contacting customers who had presented checks contained in the bag and asking them to stop payment.

2. This sum represents the time spent by existing staff on recoupment efforts.

*Noble,* 487 A.2d 231, 234 (D.C.1985) (bailment is created when possession and control over an object pass from bailor to bailee).[3] The question we must resolve is whether the bailment was gratuitous or for hire. A bailee that takes possession of goods solely for the benefit of the owner is a gratuitous bailee and liable only for gross negligence, willful acts or fraud. *See Bernstein, supra,* 487 A.2d at 234; S. WILLISTON, LAW OF CONTRACTS § 1038, at 900 (1967). In contrast, a bailee that receives compensation for its services is held to a standard of ordinary care:

> A person becomes a bailee for hire when he takes property into his care and custody for a compensation. The nature and amount of the compensation are immaterial. The law will not inquire into its sufficiency, or the certainty of its being realized by the bailee. The real question is, was the contract made for a consideration? If so, then it was a *locatum, and not a depositum,* and the defendant was liable for the want of ordinary care.... The law does not undertake to determine the adequacy of a consideration.... It is sufficient if the consideration be of some value, though slight, or of a nature which may inure to the benefit of the party making the promise.

WILLISTON, *supra,* § 1032, at 832 (quoting *Prince v. Alabama State Fair,* 106 Ala. 340, 17 So. 449 (1895)) (emphasis in original); *see also* 8 AM.JUR.2D *Bailments* § 21 (1980).

■ A bailment for hire relationship may be created even in the absence of an explicit agreement. *See* 8 AM.JUR.2D *Bailments* § 62. All that is required is the existence of a mutual benefit. As stated by one legal treatise:

For, as in gratuitous undertakings, there may exist what we call a *quasi* bailment, or bailment not strictly upon contract; namely, one whose conditions are satisfied with the voluntary acceptance of possession by one who expects some reward for his service; as, for instance, the lawful captors of a vessel, salvors ... and further, where their employment *in rem* goes not unrecompensed, sheriffs, clerks, and other officers of the law. All of these, because of a mutually beneficial possession in fact, are, regardless of an owner's permission, treated, for convenience, as hired bailees.

J. SCHOULER, A TREATISE ON THE LAW OF BAILMENTS § 94 (1897) (footnote omitted) (emphasis in original); *see also* J. STORY, LAW OF BAILMENTS §§ 613–625 (1856).

■ While there was no explicit agreement here between the bank and the District for the safekeeping of the vehicle, the District's impoundment of the bank's vehicle involved a mutual benefit so as to create a *quasi* bailment for hire. The District and TMI actively took possession of the bank's vehicle with the expectation of deriving benefit therefrom. In addition to furthering its interest in insuring the smooth flow of traffic, the District tows and stores illegally-parked vehicles for compensation.[4] Likewise, TMI is under contract with the District for the purpose of towing illegally-parked vehicles to impoundment lots. Owners of vehicles, on the other hand, receive the direct benefit of having their vehicles safeguarded in the city's impoundment lot until they are ready to retrieve them. As users of the District's roads and highways, they also benefit indirectly from the District's practice of towing

---

**3.** We find unpersuasive the District's argument that the bailment did not include the contents of the vehicle because First American failed to establish that the District's agents or employees had knowledge of the value of the dispatch bags. The bailment of a receptacle also entails liability for the contents if they are known to the bailee, regardless of their value. *See* S. WILLISTON, LAW OF CONTRACTS § 1038A, at 906 (1967). Here, the District acknowledges that the dispatch bags were in plain view of anyone looking into the station wagon. In any event, Arm-

stead's request that he be allowed to remove the dispatch bags gave the tow truck operator notice that the bags were of some value.

**4.** 18 DCMR § 2421.3 (1987) provides:

> The owner of the impounded vehicle, or other duly authorized person, shall be permitted to repossess the same upon the payment of a fifty dollar ($50.00) towing fee, plus a fee for storage, to the Bureau of Traffic Adjudication.

illegally parked vehicles that impede the flow of traffic.

■■■ Holding the District and TMI liable as bailees for hire in this case is consistent with the long standing principle in this jurisdiction that a law enforcement officer who seizes goods under a writ of attachment is bound to exercise ordinary care to prevent their loss and destruction.[5] *See Wilson v. Bittinger,* 104 U.S.App.D.C. 403, 406, 262 F.2d 714, 717 (1958); *Snyder v. Hart,* 64 App.D.C. 353, 355, 78 F.2d 237, 239 (1935); *Palmer v. Costello,* 41 App. D.C. 165, 168–69 (1913). In our view, absent any specific statutory provision to the contrary, the same standard of ordinary care applies whenever a marshal or like officer has custody of property under operation of law.[6] *See Earl v. United States,* 262 A.2d 598, 599 (D.C.1970) ("A United States Marshal is responsible for any damage caused by his negligence to property he handles while carrying out his duties."); *accord, Kessman v. City & County of Denver,* 709 P.2d 975, 977 (Colo.Ct.App.

1985) (sheriff who has custody of merchandise pursuant to an abatement of nuisance action is liable for ordinary negligence); *Simon v. City of New York,* 53 Misc.2d 622, 622–24, 279 N.Y.S.2d 223, 225 (1967) (city bound to exercise reasonable care in the towing of illegally parked motor vehicles). We hold, therefore, that the District and TMI are held to the standard of ordinary care when they tow and impound illegally-parked vehicles.[7]

■■■ We reject appellees' argument that the illegal parking by the bank's driver constituted contributory negligence or assumption of the risk so as to bar recovery. To constitute contributory negligence, the negligence must be the proximate cause of the injury. *See Sinai v. Polinger Co.,* 498 A.2d 520, 527 (D.C.1985) (plaintiff not barred from recovery unless contributory negligence a substantial factor in causing injury); W. PROSSER & P. KEETON, LAW OF TORTS § 65, at 457 (5th ed. 1984). Here, the initial illegal parking by the

5. The dissent notes that in the District of Columbia the gross negligence standard applies by statute to property seized by the police and impounded by the Metropolitan Police Department Property Clerk, pursuant to D.C.Code § 4–162 (1988). The District of Columbia did not rely on this statute or even cite it in its presentation on appeal. If this argument were before us, we would have to deal with the issue of why there should be a distinction between the two exercises of the police caretaking function in question. We would have to give weight, however, to the fact that the legislature chose to impose a higher level of proof to the police activity covered by the statute, but not to the activity with which we deal in this case. If, of course, the Council of the District of Columbia is of the view that the same standard should apply to both activities, it could adopt legislation to achieve that end.

6. While it does not establish the level of care owed, it is of some significance that, in the context of criminal cases, this court has stated that items found by law enforcement officers pursuant to an inventory search of an impounded vehicle are admissible in evidence because the government's need to protect itself from damage claims legitimized the initial search. *See United States v. Pannell,* 256 A.2d 925, 926 (D.C.1969); *Williams v. United States,* 170 A.2d 233, 234–35 (D.C.1961). Presumably the threat of damage claims would be minimal if the

government were liable for gross negligence only.

7. Although a presumption of negligence on the part of appellees was raised once First American presented evidence of a bailment and loss of property, the amount and quality of evidence necessary to rebut this presumption depended on whether the bailment was for hire or gratuitous. *See Bernstein, supra,* 487 A.2d at 234. We must defer to the trial court's finding that the District met the burden of showing that its employees and agents were not grossly negligent. *See Auxier v. Kraisel,* 466 A.2d 416, 418 (D.C. 1983) (trial court's findings of fact must be affirmed unless clearly erroneous or unsupported by the record). We are not persuaded by First American's argument that TMI's failure to follow certain procedures in the towing of the vehicle constituted gross negligence. Even assuming, *arguendo,* that internal operating procedures can create a standard of care just as government promulgated regulations do, *see Ceco Corp. v. Coleman,* 441 A.2d 940, 945 (D.C. 1982), violation of the procedures involved in this case does not give rise to liability because the procedures were not designed to prevent the sort of harm suffered by First American. *See Peigh v. Baltimore & O.R.R.,* 92 U.S.App.D.C. 198, 200, 204 F.2d 391, 393 (1953). As for the District's failure to follow its usual procedure of sealing the doors of the vehicle with tape, we are not persuaded that a piece of tape would

bank's driver was too remote from the ultimate result to have been the proximate cause of the loss of the bank's dispatch bags. *See Conn v. Hillard,* 82 A.2d 368 (D.C.1951) (where plaintiff illegally parked his car so close to second car as to confine it, his negligence not proximate cause of damage to his car when driver of second car repeatedly drives his car against plaintiff's car with great force); *cf. Simon v. City of New York, supra,* 53 Misc.2d at 622–24, 279 N.Y.S.2d at 225 (in action against the city for damage to motorcycle caused by negligent towing, plaintiff's illegal parking did not constitute contributory negligence so as to bar recovery).[8] Nor was the bank chargeable with assumption of the risk, which involves "voluntary or deliberate incurring of a known danger." *Harris v. Plummer,* 190 A.2d 98, 100 (D.C. 1963). Here, the only known danger assumed by the bank's driver when he parked illegally was that of getting the bank's vehicle towed. He did not assume the risk that the contents of the vehicle would be stolen in the impoundment lot. Moreover, his strenuous efforts to reclaim the vehicle, or at least its contents, before it was towed off, persuasively refutes the assertion that he voluntarily assumed a risk.

▆▆▆ Finally, we are not persuaded by First American's claim that appellees

wrongfully took or wrongfully retained its property so as to constitute a conversion. Conversion requires the unlawful exercise of dominion or control over the personalty of another in denial of his right to such property. *See Blanken v. Harris, Upham & Co.,* 359 A.2d 281, 283 (D.C.1976). Here, the District had authority to tow the bank's illegally-parked vehicle.[9]

In view of the foregoing, we reverse and remand this case for a determination of whether the city and TMI exercised ordinary care in safeguarding the bank's vehicle and its contents.

*So ordered.*

FARRELL, Associate Judge, dissenting:

I respectfully dissent from the majority's conclusion that when the District of Columbia government tows and impounds cars, it acts in the role of a "bailee for hire" subject to an ordinary standard of negligence. Rather than equate the government in this respect with the owner of a commercial parking lot, I would hold that in exercising the police function of enforcing the motor vehicle laws, which may include impounding cars, the District acts in a manner akin to a "gratuitous bailee" and is liable only for gross negligence.

8. The trial court cited *Hill v. Liner,* 336 A.2d 533, 535 (D.C.1975), in support of its alternative conclusion that the plaintiff bank's contributory negligence barred its recovery. In *Hill,* a tenant had exceeded the scope of the apartment owner's permission given him to park his car behind the apartment building by leaving the car there continuously for apparently two years or more. The car appeared to be abandoned, in that it lacked a windshield, was filled with debris, generally appeared inoperable, and had no indicia of ownership. The apartment owner arranged to have the car towed away, and thereafter the tenant sued the apartment owner for the loss of his car. This court held that there was no bailment under the circumstances because the apartment owner never took possession and control of the car himself, and that the apartment owner had not acted negligently in having the car removed. The court added that if the apartment owner had been negligent in connection with the removal of the car, the tenant could not recover in any event because he was

clearly guilty of contributory negligence. *Hill* is distinguishable from the case at bar in that its statement concerning contributory negligence related to the tenant's responsibility for the immediate consequence of his abandonment of the car, *i.e.,* the towing, as distinguished from his responsibility for a remote consequence such as we have in this case, *i.e.,* the subsequent loss of goods from a supposedly secured vehicle due to the negligence or intentional misconduct of an unknown party.

9. 18 DCMR § 2421.1 (1987) provides:
 Any unattended vehicle found parked in violation of any traffic regulation, except overtime parking of less than twenty-four (24) hours, may, by or under the direction of a member or members of the Metropolitan Police force or employees of the Department of Public Works, either by towing or otherwise, be *removed or conveyed to any street* where parking is not prohibited (except for more than eighteen (18) hours) or be removed or conveyed to and impounded in or at the police precinct station of the police precinct in which the vehicle may be found, or any other place designated by the Director.

The District's obligation to tow, impound, and store vehicles derives from D.C.Code § 40-812(a) (1990).[1] One purpose of this duty is to help abate the "parking nuisance" that "endangers the health, safety, and welfare of the general public." D.C. Code § 40-802. I agree with the majority that if the District (as bailee) had a profit-making or benefit-seeking purpose in towing and impounding cars, then a mutual bailment would be formed. *See Prince v. Alabama State Fair*, 106 Ala. 340, 344-46, 17 So. 449, 450 (1895). But since it is the duty to abate the "parking nuisance" that motivates the District, any benefits derived from seizing and keeping cars temporarily flow to the general public, not to the government as a contracting party. The "compensation" the government receives in the form of towing charges or storage fees is completely incidental to this exclusive benefit to the public at large. Indeed, I am certain the government would willingly relinquish the "benefit" of storage fees if society did not require it to enforce the parking laws.

I am not persuaded by the majority's reliance on decisions stating the principle that a law enforcement officer who seizes goods under a writ of attachment must exercise ordinary care to prevent their loss and destruction. It seems to me those cases are distinguishable, and in the main fit the general mold I have described which distinguishes between profit-seeking bailees and those pursuing (by enforcing the law) a benefit for the general public. It is true that judicial officers levying upon writs of attachment are liable for ordinary negligence.[2] *Palmer v. Costello*, 41 App. D.C. 165, 168-69 (1913); *Matoil Service & Transport Co. v. Schneider*, 129 F.2d 392, 394 (3d Cir.1942) (U.S. Marshal's duty of ordinary care arises from admiralty law not bailment theory). Courts often compare property levied upon on a writ of attachment to property that is subject to a mutual bailment, and thus impose the ordinary negligence standard. *Kessman, supra* note 2, 709 P.2d at 977; *Ritter v. Castellini*, 173 N.J.Super. 509, 514-16, 414 A.2d 614, 617 (1980). The reason they impose a mutual bailment on property subject to writ of attachment is that the writ's purpose is to maintain the status quo of the property pending a judicial proceeding. *Kessman, supra*, 709 P.2d at 977. In these cases the judicial officer (sheriff or marshal) is in the same position as a bailee of goods for the purpose of custody and sale, with a corresponding duty to preserve the value of the property. *See* 70 AM.JUR.2d *Sheriffs, Police, and Constables* § 116 (1987). Since any damage to the property would permanently deprive the execution creditor of valuable rights in the property,

1. Section 40-812(a) provides in part:

 It shall be a violation of the District of Columbia Traffic Adjudication Act (D.C.Code, § 40-601 et seq.), to park, store, or leave a vehicle of any kind, including an abandoned or junk vehicle, whether attended or not, or for the owner of any vehicle to allow the vehicle to be parked, stored, or left, whether attended or not, upon any public or private property in the District of Columbia, including a public highway, without the consent of the owner of the public or private property.

2. A distinction should be made between levying on an attachment and executing a writ of restitution. Judicial officers also execute writs of restitution (evictions). *See* Super. Ct. L & T R. 16. The standard of care when executing such writs is ordinary care. *Earl v. United States*, 262 A.2d 598 (D.C.1970); *Wilson v. Bittinger*, 104 U.S.App.D.C. 403, 262 F.2d 714 (1958); *Snyder v. Hart*, 64 App.D.C. 353, 78 F.2d 237 (1935); *Jeffres v. Countryside Homes of Lincoln, Inc.*, 214 Neb. 104, 122-24, 333 N.W.2d 754, 764

(1983) (private company that assisted constable in executing writ of restitution is liable for negligence). This standard is limited to the time when the judicial officer is actually conducting the eviction. Once the writ is executed, the duty ends; there is no duty of safekeeping of property or liability for subsequent damage to the property during storage. *See Kessman v. City and County of Denver*, 709 P.2d 975, 977 (Colo. Ct.App.1985). *See also Wilson v. Bittinger, supra* (Marshal's potential liability limited to the conduct of moving property from the apartment to the sidewalk). Since the purpose of a writ of restitution is to restore possession of real estate to the prevailing landlord, the movement of the tenant's personal property is incidental to the execution of the writ. Any liability of the judicial officer arises from his duties as an officer of the court, not from his temporary control of personal property. Therefore, the standard applicable to judicial officers executing writs of restitution does not apply to government employees who tow and impound automobiles under the traffic law.

the judicial officer as bailee under the law is liable for ordinary negligence. *Id.*

As custodian of automobiles under the vehicle impoundment law, however, the District is not in the position of a bailee for the purpose of preserving property for custody and sale. The impoundment law merely authorizes temporary storage by the District for the purpose of enforcing the parking laws. Thus, in my view, the standard of care applicable to sheriffs and others authorized to seize and sell property in satisfaction of judgments does not apply to government officers required to impound cars when necessary for the public safety.

I note that in the District of Columbia the gross negligence standard applies by statute to property seized by the police and impounded by the Metropolitan Police Department Property Clerk. D.C.Code § 4–162 (1988). It could be argued, I suppose, that the Council's failure to enact a similar statute in the case of police impoundment of cars shows that it intended a lesser standard to apply in that context. Although this argument is not without force, much more significant to me is the conceptual difficulty, if not impossibility, of distinguishing between the two exercises of the police caretaking function.

I think, finally, that we must be concerned with the practical consequences of a rule that a person who parks illegally, and so endangers the public safety (certainly at rush hour), can reasonably require the District to insure against lapses from ordinary care in the impoundment process. It is true that reasonable care means care "under the circumstances" (which presumably would include rush hour and the like), but as between the rights of the owner who violates the law in parking, and the duty of the police to clear the streets and prevent accidents, I believe that a standard of ordinary negligence strikes too low a balance and acts as a disincentive to effective enforcement of the parking laws.

