Lisa A. HULTGREN, et al., Plaintiffs,

v.

COUNTY OF LANCASTER, etc., Defendant.

No. CV88–L–93.

United States District Court, D. Nebraska.

May 10, 1990.

As Corrected May 15, 1990.

Burns & Grenier, James D. McFarland and Beverly Evans Grenier, Lincoln, Neb., for plaintiffs.

Michael Thew, Deputy County Atty. and Ronald E. Bucher, Sp. Deputy County Atty., Lincoln, Neb., for defendant.

## MEMORANDUM AND ORDER

DAVID L. PIESTER, United States Magistrate Judge.

This action came on for trial before the court on March 15, 16 and 17 of 1989 with the undersigned Magistrate presiding by consent of the parties pursuant to 28 U.S.C. 636(c). (Filing 23). Plaintiffs filed this action seeking recovery of unpaid wages, overtime compensation, liquidated damages and attorney's fees pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. (hereafter FLSA).

The uncontroverted facts as agreed to by the parties are as follows: The plaintiffs are former or present employees of the County of Lancaster, Nebraska. The defendant is a political subdivision of the State of Nebraska and is an employer as that term is defined by the FLSA at 29 U.S.C. § 203 and the plaintiffs were at all times as set forth herein employees within the definition of that same section. It is uncontroverted that the defendant, at all times relevant to the suit, was an employer engaged in commerce or in the production of goods for commerce, or employment in an "enterprise" so engaged such that the "maximum hours" provision of the FLSA, 29 U.S.C. § 207, is applicable to this defendant.

During the relevant time period of this suit, as set forth below, the plaintiffs were employed as Human Service Instruction Assistants (hereafter HSIAs) at residential facilities for the "care and supervision" of mentally retarded clients, such facilities being operated by the Lancaster County Office of Mental Retardation, a department of Lancaster County (hereafter the defendant). Plaintiff Lisa A. Hultgren was employed as an HSIA I from November 19, 1981 through October 19, 1988. Hultgren's salary, based on an hourly rate, was as follows:

Nov. 19, 1981 to Dec. 18, 1985—$5.80 per hour

Dec. 19, 1985 to Aug. 27, 1986—$6.072 per hour

Aug. 28, 1986 to Dec. 17, 1986—$6.248 per hour

Dec. 18, 1986 to Sep. 2, 1987—$6.528 per hour

Sep. 3, 1987 to Oct. 19, 1988—$6.724 per hour

Plaintiff Victoria M. Smith has been employed by the defendant as an HSIA since January 14, 1980 and continued to be employed in that capacity as of the time of trial. For the time period relevant to this suit Smith's salary, based on an hourly rate, was as follows:

Aug. 29, 1985 to Aug. 27, 1986—$6.344 per hour

Aug. 28, 1986 to Sep. 2, 1987—$6.528 per hour

Sep. 3, 1987 to present—$6.724 per hour

The uncontroverted facts set forth in the Order on Pretrial Conference, Filing 21, indicate that plaintiff Daniel R. Turner was initially employed on July 24, 1986. Indeed, plaintiffs' complaint refers to July 24, 1986 as the hire date of Turner. This date, however, is not in accordance with the documentary and testimonial evidence at trial which would support a finding that Turner was employed on July 25, 1985. For purposes of this action, any judgment for the plaintiffs is restricted to the time period subsequent to April 15, 1986 (for reasons that will be addressed below) and while the evidence admitted at trial shows that Turner, as with the other plaintiffs, is claiming overtime and unpaid wages from April 15, 1986, the pleadings would seem to limit any compensation for Turner to a period of time subsequent to July 24, 1986.

Upon reviewing the evidence submitted at trial, it appears that the July 24, 1986 hire date stipulated to in the pre-trial order is merely a typographical error that was carried over from the original complaint. All of the evidence, including employee history documents from the defendant, indi-

cates that Turner was hired as an HSIA I substitute prior to July 24, 1986. The evidence includes copies of time cards which shows hours worked prior to July 24, 1986 (Exhibit 21), monthly staff schedules indicating that Turner was a scheduled employee prior to that date (Exhibit 20), an employee description for Turner dated 3/19/86 (Exhibit 26), a short employee agreement signed by Daniel Turner on 7/25/85 (Exhibit 27), an employee wage history for all plaintiffs in this action showing Turner's appointment date as 7/25/85 (Exhibit 22), an HSIA I employee agreement signed by Turner on 7/25/85, a computer printout recapping Turner's time cards and showing his claim for unpaid regular and overtime hours beginning 4/14/86 (Exhibit 18A), and finally Turner's testimony that he began his employment with the defendant on July 25, 1985. This inconsistency was apparently not noticed at trial by either party and none of the evidence indicating a hire date prior to July 24, 1986 was objected to by the defendant.

■ This inconsistency is a minor portion of the dispute in this case; however, if this court found as fact that Turner was entitled to damages in the form of unpaid regular and overtime hours from July 24, 1986 as opposed to April 15, 1986, Turner would lose a considerable part of the relief requested in this action. Despite the peripheral importance of this problem in the scheme of things, I cannot lightly ignore the reality that the July 24, 1986 hire date was a stipulated fact set forth in the pretrial order pursuant to an agreement by the parties. The court cannot easily disregard such stipulations. As stated by the Eighth Circuit in *Sims v. Wyrick*, 743 F.2d 607 (8th Cir.1984):

> We have consistently held that stipulations of fact fairly entered into are controlling and conclusive, and that relief from such stipulations will be granted only under exceptional circumstances. (Citations omitted).

*Id.* at 610. Under Fed.R.Civ.P. 16 the pretrial order "controls the subsequent course of the action, unless modified at the trial to prevent manifest injustice."

On the other hand, given the circumstances of this case, it would exalt form over substance to turn a blind eye to the fact that *all* of the evidence admitted at trial relating to Turner's hire date indicates that he began employment with LOMR well before July 24, 1986. While the Eighth Circuit wisely took a strict view of the binding nature of stipulations of fact in pretrial orders in the *Sims* case, it has also held that flexible application of pretrial orders is within the sound discretion of the court. *Patterson v. F.W. Woolworth Co.*, 786 F.2d 874 (8th Cir.1986); *Dabney v. Montgomery Ward & Co.*, 692 F.2d 49 (8th Cir.1982), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2429, 77 L.Ed.2d 1316 (1983). Such a rule is also recognized in this passage:

> Although federal judges generally recognize the binding effect of the pretrial order, this does not mean that it is rigidly and pointlessly adhered to at trial. The application of preclusion always is viewed as a matter of judicial discretion.

6 C. Wright & A. Miller, *Federal Practice and Procedure* § 1527, at 608 (1971).

In the spirit of Rule 16, I conclude that in order to prevent "manifest injustice" the stipulated hire date of July 24, 1986 must be disregarded in light of the total contradiction of that allegedly "uncontroverted fact" as found in the evidence admitted at trial. It cannot be said that the defendant will suffer any prejudice or surprise by this action given that many of the documents establishing the inaccuracy of the July 24, 1986 date appear to be personnel documents prepared by the defendant; nor was there any objection by the defendant at trial to the introduction of these documents. I therefore find as fact that plaintiff Daniel Turner was hired by the defendant on July 25, 1985. The uncontroverted facts establish that Turner's salary for the relevant time period, based on an hourly rate, was as follows:

Aug. 29, 1985 to Aug. 27, 1986—$5.067 per hour

Aug. 28, 1986 to Feb. 25, 1987—$5.214 per hour

Feb. 26, 1987 to Apr. 15, 1987—$5.462 per hour

Apr. 16, 1987 to Sep. 2, 1987—$5.968 per hour

Sep. 3, 1987 to Oct. 7, 1987—$6.147 per hour

Oct. 8, 1987 to present—$6.435 per hour

The relevant time period for this suit begins on April 15, 1986 and ends with the filing of the complaint on February 18, 1988. While the plaintiffs were all employed prior to April 15, 1986, it has been established that they are not entitled to any overtime pay prior to that date in light of the fact that the defendant was not required to pay overtime rates prior to that time. It was not until *Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), that the United States Supreme Court definitively brought public agencies such as the defendant within the scope of FLSA. The 1985 amendments to the FLSA codified *Garcia* and made many changes and clarifications as to the Act's applicability to government employer's and employees. *See,* Public Law 99–150, 99th Congress, 1985. The effective date of these amendments was April 15, 1986.

At a brief conference immediately prior to trial the court ruled that any award of damages or evidence relating thereto would be limited to the period ending on the date on which the plaintiffs' complaint was filed, February 18, 1988.

## FINDINGS OF FACT

Lancaster Office of Mental Retardation (a.k.a. LOMR), a Lancaster County agency, owns and operates numerous homes in residential areas which are homes for clients with mental retardation. The LOMR organizational structure, in descending order of authority, includes the department head, residential coordinators, residential managers and the human service instruction assistants (HSIAs), the latter position being held by the plaintiffs in this case. Each group home is supervised by a residential manager who either resides on the premises or resides there for extended periods of time. The HSIAs are essentially relief employees for the residential managers, and

the relief hours could include daytime or nighttime hours or both. In this case the uncompensated hours at issue are the overnight hours known as "sleep time."

The primary responsibilities of the HSIA are the care and supervision of the clients but the duties required to implement these responsibilities are numerous and involve every aspect of the client's life. The HSIA job description, in part, is as follows:

This is human service work instructing mentally retarded clients (children and adults) in basic social and educational skills.

Work involves the responsibility for utilizing individual program plans to instruct mentally retarded clients in social, vocational and educational skills, such as, production skills, toilet training, feeding, dressing, motor coordination, money usage, cooking, shopping, telling time, and other social skills. Work also includes preparation of meals; maintaining sanitary living conditions; administering medication; recording daily activities of clients; and providing input to superiors concerning physical and emotional needs and progress of clients.

(Exhibit 25). The two responsibilities rated highest for the HSIA job classification are as follows:

1. Direct Care Services to Clients: Provide assistance to clients so their physical and psychological needs are met.

2. Health Care, Medications, Safety: Follow agency procedures and exercise good judgment so client's health care and safety needs are met.

(Exhibit 26, p. 2) Specifically, HSIAs are required to be client advocates and teachers; they must ensure proper grooming for the client; arrange or provide transportation for recreational or emergency needs; assist non-ambulatory clients with braces, body jackets or other prosthetic devices; monitor, administer and record the client's medication; be familiar with the medications being given; know proper physical intervention techniques for emergency situations; be prepared for client accidents or illnesses to ensure adequate treatment and have first aid knowledge; be prepared for

emergencies such as fire, tornado, lost/missing/run-away clients, care of serious or minor injuries, etc.; assist in teaching independence skills; conduct self in a professional manner including following rules and regulations of the agency; communicate with client families, supervisors, co-workers, volunteers, and the public to the benefit of the client; instruct, prepare and serve preplanned meals; teach proper table manners and kitchen skills; maintain proper sanitation standards; some grocery shopping and menu preparation; involve client in recreational activity in the home as well as out of home; monitor recreational activity such that client safety is ensured; assist client in using community resources; teach and participate in home maintenance and repair both interior and exterior; do household laundry and house cleaning as needed; assist in client finances and purchase choices; and maintain necessary facility and client records. (Exhibit 26).

The duties listed above are not all inclusive, but they demonstrate the vast range of duties and the serious responsibilities involved in the jobs undertaken by the plaintiffs. Residential managers and HSI-As at these group homes are indeed in a position analogous to a parent and are responsible for the health, safety and general well being of the clients at the homes.

The clients cared for by the plaintiffs in this case have a wide range of psychological and physical disorders which require special and individualized care. The testimony at trial established that the plaintiffs worked at several different group homes which generally housed from three to six clients.

## EASTRIDGE FACILITY

Plaintiffs Turner and Hultgren worked at the facility known as Eastridge; specifically, during the relevant time period of this suit Turner worked fifteen overnights at Eastridge and Hultgren worked forty overnights at that residence. The evidence indicates that Eastridge was a difficult work site due to the clients housed at that facility. The house itself had five bedrooms plus a staff/office room, a living room, kitchen, and bathroom. Five male clients resided at Eastridge and ranged in age from their early twenties to late forties. They were generally a disruptive group, physically aggressive and hard to control, and all were on various behavior modification drugs.

"Clyde" is in his early forties, has been a LOMR client for twenty years. He is five feet eight inches tall and weighs approximately one hundred fifty pounds. Both Turner and Hultgren described "Clyde" as abusive to others as well as himself and aggressive. He has been known to hit himself with forks, pens, or his own hand. Turner had been told by the residential manager to take "Clyde's" threats and actions seriously and to intervene to stop the activity. "Clyde" has several disruptive propensities which created a need for special measures to control his behavior. First, he has a tendency to run away from the group home which resulted in alarms being installed on his bedroom door and windows. Over time "Clyde" learned to trick the alarms by opening and shutting his door quickly thus keeping the alarm from sounding. Second, he often went on nighttime refrigerator raids to get food or attempted to break into the staff office to get cigarettes or attempt to find money. The refrigerator in the house was kept locked but "Clyde" apparently was able to gain access by unscrewing the door hinges. If unable to find a lighter for a cigarette he would turn on the electric stove burner to use as a lighter. "Clyde" was also known to urinate out his bedroom window or expose himself at the window. He had a television in his bedroom which was set at a high volume and occasionally he would fall asleep with it still on requiring a staff member to get up, go to his room and turn it off.

"Drew" is an aggressive and suicidal client who suffers from "active" hallucinations and is at times delusional. He is both physically and verbally aggressive to the staff. He too has a tendency to run away from Eastridge and at least once ran into a busy street, requiring Turner to physically restrain him. He often misunderstands staff's intentions and sees them as threat-

ening. "Drew" occasionally loses all sense of time and will get up at 2:00 or 3:00 A.M., shower, get dressed and demand breakfast and his cigarettes. This generally occurs when he is going through a change in his behavior medication. "Drew" has a loud cough due to smoking and is loud when closing doors. These factors cause several interruptions for staff at night.

"Glenn" is five feet tall, weighs one hundred eighty pounds and has a large upper body and arms. His legs are incapacitated and he uses crutches to move around. He is described as "extremely violent" and tends to throw tantrums, spit, hit, or bite at staff and is also self-abusive. "Glenn" has a tendency to intentionally plug up the bathroom stool then overflow it, then stand in the bathroom and scream. He also has a habit of crawling into the living room at night and repeatedly calling the staff person's name. The staff must then escort and often drag him back to his room. He will also yell staff's name from his room and pound his crutches on the walls or floor.

"Gary" is five feet eight inches tall, is very strong and both physically and verbally aggressive. He has a tendency to throw tantrums and has kicked holes in his door and attempted to "destroy his room." "Gary" has a habit of dressing in female clothes if female staff members bring extra clothing and leave it where he has access to it. For that reason Hultgren was told not to bring "feminine" looking clothing to this residence.

"Terry," the youngest, is the fifth client at Eastridge and is fairly "mild mannered." "Terry's" legs are incapacitated and he requires toileting and bathing assistance but does not tend to interrupt staff at night as do the others residents.

## RIDGEVIEW FACILITY

Plaintiffs Turner and Smith worked overnights at a facility known as Ridgeview, a one level house with five client bedrooms, a staff bedroom, staff office, living room, kitchen, and bathroom. The bedrooms and the kitchen/living room areas were located at opposite ends of the house. Turner worked approximately twenty overnights at Ridgeview from April 1986 to February 1988 while Smith worked ninety-five overnights from September 1985 to January 1988.

Ridgeview housed five male clients ranging in age from late thirties to their fifties. "Gerald S." is described as self-abusive and prone to "steal" coffee and pop from the kitchen. He made frequent nighttime bathroom trips, a minimum of five to six times per night and other nights up to twenty to thirty times per night. He also would clog and overflow the bathroom stool or repeatedly flush the stool. "Gerry S." had a history of psychotic behavior and was on medication for control of that problem. He had limited speech abilities, often merely engaged in repetitive speech and the extent of his conversation was to ask for pop. Smith testified that "Gerry S." would knock on the staff bedroom door, enter the room and stand over her just watching, would make nighttime trips to the kitchen for pop, or would go outside fully dressed. "Gerry" apparently got outside unnoticed one night and no one realized it until he was banging on the door early in the morning because he had locked himself outside. Smith generally slept in the staff bedroom but for a time began sleeping in the living room to be more aware of "Gerry's" movements. Chairs were placed in the hallway to try and discourage him from coming to the kitchen or going outside.

"Kim" was aggressive and abusive both to himself and to staff. He would bite himself until he drew blood or continually pick scabs until they bled. He had a tendency to throw things, fling furniture at walls, and strike staff and other clients. "Kim" was non-verbal but did understand commands from the staff. On occasion he would rise at 5:00 A.M. and go to the kitchen or turn on the television but staff could generally get him to go back to bed without much difficulty although it required getting up to accomplish the task. "Kim" generally was up to the bathroom once or twice per night.

"Gerald N." is afflicted with cerebral palsy which caused rigid walking and poor balance. As a result of his illness "Gerald N." walks loudly and often slaps his hand against the wall as he walks in an effort to keep his balance. This noise is more pronounced at night due to the fact that his balance is worse when he has been sleeping.

"Steve" is a deaf individual, walks rigidly and slowly and requires assistance in grooming and dressing. His communication skills are confined to a limited signing ability. "Steve's" nighttime bathroom visits are a problem for staff because he has a tendency to urinate in inappropriate places such as his shaving kit or other containers in the bathroom or play in his feces. He also is known to place certain objects, such as toothbrushes, into his rectum; a habit which requires staff to be particularly aware of his nighttime activities. He tends to be loud going to and from the bathroom and generally makes loud noises while he is up.

"Gilbert" is physically impaired on one side of his body having no use of one arm, and one leg is considerably shorter than the other. He has a history of seizures, is on medication for that condition, and requires the use of a protective helmet. His speech ability is very limited. At night "Gilbert" often falls getting out of bed due to his physical impairments and "stomps" loudly to the bathroom. On at least one occasion Smith was unable to sleep due to "Gilbert" masturbating in his room which was next to the staff bedroom.

## NORTH 3RD FACILITY

Turner and Hultgren worked at the North 3rd group home which was occupied at the relevant time by five female clients. This home was also all on one level with five separate client bedrooms and a staff bedroom plus a kitchen, living room and a den. Turner worked at this facility on two overnights and Hultgren worked approximately twelve overnights.

At least three of the female clients at this residence were troublesome to staff. "Rose" tended to be a hypochondriac and often complained of stomach aches and would have itching spells so intense that she would make her skin bleed.

"Michelle" was described as extremely violent and often self abusive. She occasionally had to be held down to calm her if she was out of control. She would also run out of her bedroom at night and into other clients rooms to attack them by pulling their hair and hitting them. She would at times try to bite or claw the staff. At night she would often get out of bed and come into the living room, kitchen or den to turn on the stereo. Hultgren described one incident where "Michelle" came into the living room and attempted to lay down on the couch where Hultgren was sleeping.

"Sandy" was briefly described as aggressive and self abusive. "Marlene" apparently would awaken and get out of bed to ask the staff what time it was.

Turner's first night at the North 3rd residence was traumatic at best and he got no sleep. "Michelle" threw a tantrum and they no sooner got "Michelle" calmed down when "Rose" began an itching spell and had to be comforted. The residential manager, who was at the home both nights when Turner worked, warned Turner to be alert in the house for client activity. Hultgren described her overnights as being interrupted an average of five to six times resulting in an average nights sleep of zero to four hours.

## STARR STREET FACILITY

The Starr Street home was occupied by three adult females with Downs syndrome, two of whom were twins. Hultgren worked approximately one hundred fifty-five overnights at this facility between April 1986 and February 1988 while Smith worked only three overnights.

The female clients at Starr Street had limited vocabulary and were difficult to understand. One of the clients was hearing impaired. The staff bedroom in this home was directly across the hall from the only bathroom, and at least one client per night would make a bathroom visit which disturbed the plaintiffs. One of the client's

talked loudly in her sleep and occasionally had nightmares.

These clients would occasionally leave the bathroom in an unsanitary condition. There were times when a client would start her menstrual period and leave the bathroom in "a mess" or on two occasions Hultgren described feces in the bathroom and on the stool. One evening Hultgren was directed to "clock" out at 11:00 P.M., bedtime, but to leave the front door unlocked because the clients would be coming in late from an outing. On two or three nights Hultgren's sleep was interrupted by a client who was scared of thunderstorms. On one occasion, in order to calm the client, the plaintiff moved out into the living room on the floor to sleep so the client could be beside her.

## CLEVELAND STREET FACILITY

Turner worked overnights at three other locations. The Cleveland Street group home was a large five bedroom house on one level. The facility housed five male clients. "Henry" was a small man, five feet tall and weighing only one hundred twenty pounds, was non-verbal, reclusive and liked to eat and sleep. He did not, however, like to stay in bed at night and made several trips to the kitchen at night. Turner would have to get up, turn "Henry" around and put him back in bed. He generally tried returning to the kitchen two or three more times per evening. The house staff policy was that after the fourth time it was better to simply let "Henry" sleep in the kitchen. Eventually, after discussions with the residential manager, it was decided that the kitchen chairs would be removed in an attempt to discourage "Henry's" nighttime kitchen trips and put an alarm on his door.

"Grant" was twenty years old and six feet tall. He was generally disoriented, confused and was known to have behavioral outbursts; although Turner never witnessed such behavior while he was at the home. "Grant" had a tendency to rise early in the morning and wander around the hall asking if it was time to get up. If he was told it was not, he would occasional-ly go back to bed on his own. "Grant" was generally quiet when and if he went to the restroom at night.

"Jerry" is a blind individual in his early thirties, is talkative, has a job and an "excellent memory." On the occasions that "Jerry" would use the restroom at night he would wake the plaintiff because he would "bang" his cane down the hall for direction. Although the noise would awaken Turner, he did not have to get up to attend to "Jerry" because he would go back to bed on his own.

"Stacey" is in his early twenties and is a small man. He had no ability to move on his own, his arms and legs being entirely useless. He required an enema every three days and generally was entirely dependant on the staff for all his needs, including being moved in his bed from time to time.

"Cameron" is approximately five feet tall and very muscular. He tended to be self abusive, would yell and "bang his head on his knees" or hit himself. It was generally necessary for the plaintiff to intervene when this self-abusive activity took place.

## 39TH STREET FACILITY

In addition to Cleveland Street, Turner worked some twenty overnights at the 39th Street group home, a small two-story house with three client bedrooms but no separate staff bedroom. A separate staff office was located in the basement, however, it was not used for staff sleeping. This residence housed three male clients; "Joe", "Mark", and "Matt." "Joe" is six feet tall, weighs one hundred eighty pounds and is extremely aggressive. Behavior modification drugs are used to control his outbursts; however, there is almost no controlling him when he acts out aggressively. He has thrown lamps, tables, and forks when angry and will hit, kick and bite the staff. He is also described as self-abusive. Turner described overnight incidents where "Joe" would stand over him and "watch him sleep" (which Turner said he would simply try to ignore) or just walk around the house or stand in one place for a time. "Joe" also had a tendency to run away

from the group home if he was not monitored closely.

"Mark" is five feet three inches tall and at the time relevant to this suit weighed three hundred thirty pounds. He has a propensity for tantrums and has run away from the group home as late as 10:00 P.M. "Mark" is very loud at nighttime when he is up to the bathroom in that he slams the doors to every room he goes to and from. He is usually up two times per night.

"Matt" is known for his tendency for stealing and tantrums. He too is very noisy when he goes to and from the bathroom at night which is particularly a problem for staff since "Matt's" door is approximately fifteen feet from the couch where the staff sleeps.

## JOYCE STREET FACILITY

Finally, Turner worked two overnights at the Joyce Street home which housed three male clients who "habitually slept through the night." In addition this house, unlike all the others, was set up with totally separate bathroom facilities for staff which was located in the staff bedroom which was at the opposite end of the house from the client bedrooms. Whether it was the clients or the location of the rooms, this home afforded a reasonable night's sleep for Turner.

## BERKSHIRE APARTMENTS

Besides the group homes referred to above, Victoria Smith also worked three overnights at the Berkshire Apartments. Within the apartment complex, seven LOMR clients rented four separate two bedroom apartments. The sleeping accommodations for staff were located in the men's apartment and consisted of a hide-a-bed in the living room. The women clients who occupied the other three apartments were required to call Smith when they arrived at their apartments at night. These calls often came after 10:00 P.M. when Smith had "clocked out" for her "sleep time" for which she was not compensated.

The two male clients in the apartment in which the staff slept were "Tom M." and "Mark P." "Tom" is in his mid thirties of average height and weight and fairly verbal. He is quite independent, walks to and from his worksite and does not particularly like the staff that stays at his apartment and avoids interaction with them.

"Mark P." is in his mid to late twenties, is "easy-going" and independent. He enjoys staying up late to watch television which is a problem in that the television is in the living room where staff must sleep. In addition, "Mark" is a hepatitis B carrier, a fact which concerned the plaintiff in part because LOMR gave her little or no information as to safety precautions in dealing with persons having the condition or in sharing their living quarters. "Mark's" hygiene skills were unsatisfactory and the shared bathroom was unclean. The television was a particular problem for the plaintiff on her overnights at Berkshire because she could not sleep with it on and with "Mark" in the room yet she could not claim the time because she was not "attending to the client." She testified that she could not ask "Mark" to shut the television off because it was his "home."

## NORTH 14TH STREET FACILITY

In addition to the group homes mentioned above, Lisa Hultgren spent one overnight at a home on North 14th which was a "private residence" in which a male LOMR client lived with a family. The night Hultgren stayed at North 14th, she and the client were the only persons in the house. "Kevin" was described as quiet and "laid back" but difficult to understand verbally. He has few behavior problems except a history of masturbating in public places. The plaintiff slept on a living room couch, fully clothed, and although the client did not interrupt her sleep, she did not sleep well given the unfamiliarity with the client and the surroundings.

## SLEEP INTERRUPTIONS

The defendant's "sleep time" policy stated that this time was to be uncompensated with the exceptions that (1) interruptions for "calls to duty" (i.e., getting out of bed and attending to a client) of more than a

ten-minute duration could be documented and compensated and (2) if the employee got no more than five hours of uninterrupted sleep the entire eight hours must be compensated. The executive director of LOMR during the relevant time, Brian Lensch, testified that he believed the Wage and Hour bulletins did not require that the five hours of "uninterrupted sleep" be "consecutive" hours of sleep.

The plaintiffs in this action admit that they were paid for documented "calls to duty" that lasted more than ten minutes. Indeed for some of the overnights plaintiffs were compensated for the entire sleep time period of eight hours and they are not seeking further recovery for those nights in this suit. The difficulty arises when one considers the interruptions in sleep time that plaintiffs were unable to document because the time was less than ten minutes or they were not required to get out of bed to attend to the client. The evidence in this case indicates that these interruptions were numerous.

Turner testified that at the Eastridge facility "Clyde" was often up at night either in an attempt to escape, going to the kitchen or breaking into the staff room where the cigarettes were kept. Generally the alarm on "Clyde's" door would go off when he came out of his room which would alert Turner that "Clyde" was out of his room. Generally, with the bathroom interruptions or the kitchen visits Turner was either not required to get out of bed, because he could merely listen to hear if "Clyde" returned to his room, or he was not up for more than ten minutes because he merely escorted "Clyde" back to his room. The escape attempts were usually claimed and compensated in that these interruptions involved getting up and being up for more than ten minutes and often in excess of an hour. The bathroom interruptions from "Clyde," which were usually one or two times per night, occurred during one-third to one-half the overnights Turner worked at Eastridge, the interruptions from "Clyde" going to the kitchen happened one of every five to eight times Turner worked; and there were four to five incidents where Turner had to go to "Clyde's" bedroom to turn off the television that he had left turned on after bedtime.

Turner's interruptions from "Drew" at Eastridge occurred during one-third to one-half of the overnights that Turner was at the facility and were described as frequent interruptions, but a minimum of two to three times per night. The interruptions involved "Drew" being in the bathroom with a coughing attack after having awakened Turner by loudly slamming the doors to his bedroom and the bathroom. Sometimes "Drew" would ask Turner for cigarettes at night and on other occasions "Drew" would be awake and delusional; however, during these latter incidents Turner's waking time was compensated because it took some time to settle the client down. Again it should be noted that none of the plaintiffs are requesting any further compensation for the "calls to duty" that were paid for when documented.

"Glenn" was awake and creating a disturbance at least three times that Turner recalls and on these occasions Turner was compensated because it took longer than ten minutes to settle him down and get him back to his room.

In total, Turner estimated that he averaged two to three hours of sleep per night at Eastridge even though he was lying down on the couch for six to seven hours.

Hultgren testified that "Clyde," "Drew," and "Glenn" were all up frequently at night and that she had her sleep interrupted on the average of five to six times per night while at that facility. She estimated that one-fourth to one-third of these interruptions were documented and paid for, and the rest were interruptions that did not require getting up or were for less than ten minutes. She further stated that she averaged a minimum of zero to four hours sleep at this facility but generally did not get more than four hours due to interruptions.

Turner and Smith both worked at the Ridgeview facility and both testified to frequent interruptions in their sleep. Both of these plaintiffs indicated that "Gerald S."

created the most nighttime disturbances due to his many bathroom trips. Turner stated that "Gerald S." was up a minimum of five to six times per night and at times anywhere from twenty to thirty times. None of these frequent interruptions were claimed as compensable time by Turner due to the short time duration. Smith corroborated this testimony and stated that "Gerry" was up as many as twenty-five to thirty times in the bathroom and at times clogged and flushed the stool. She also noted that he had knocked on her door at night and had come into her room where she slept, would go to the kitchen for coffee or tea, and would at times go outside fully dressed. Smith sometimes slept in the living room to try to prevent "Gerry's" late night excursions or put chairs in the hallway to discourage his behavior.

Turner further testified that "Kim" would usually wake him up one or two times per night, none of which were compensated and that "Gerald N." would go to the kitchen and bathroom once per night. Turner averaged four to five hours of sleep at Ridgeview but often received less than that.

Smith stated that "Steve" was up to the bathroom as many as five times per night, only two of which she generally regarded as "legitimate" trips. "Steve's" activities in the bathroom had to be monitored closely because of his propensity to urinate in inappropriate places and his tendency to insert objects into his rectum. "Gilbert" was up from one to three times to the bathroom and was very loud, and at times fell out of bed, due to the one leg that is considerably shorter. On one occasion "Gilbert's" masturbation in bed kept Smith awake since she, on that night, stayed in the staff bedroom which was beside his room. "Gerald N." would go to the bathroom once or twice a night and he too was very loud largely due to his poor balance which was worse when he had been sleeping. "Kim" was at times up very early, ready to be up for the day and also was up once per night to the restroom.

Smith testified that she averaged two to four hours of sleep per night at Ridgeview,

sleeping "very poorly", but did receive more than four hours on a "few nights" and no sleep at all "some nights," and was generally interrupted five to fifteen times per night and not able to get back to sleep right away.

Smith and Hultgren both worked overnights at the Starr Street facility. Smith was at that facility only three times during the relevant time period of this case. She testified that she had two to five interruptions per night while she was there from each of the three clients going to and from the bathroom once per night and also from hearing the one client who talked in her sleep at night. None of these interruptions was documented because they were less than ten minutes in duration. Smith averaged four to five hours of sleep at Starr Street due in part, she stated, to her having trouble getting to sleep because of the unfamiliar setting, and part to her anxiety from "bad locks" on the house and the "bad neighborhood" in which the house was located.

Hultgren testified that she had her sleep interrupted two or three nights from a client who was scared of a thunderstorm waking her up. In addition, the clients would go to and from the bathroom at least once per night. As with Smith, Hultgren also had sleep interruptions from the client who talked loudly in her sleep, this happening at least once every weekend overnight she was there. None of these interrupts was compensable time due to the fact that the plaintiff was not required to get out of bed. Hultgren got less than four hours of sleep at Starr Street approximately ten per cent of the time and managed to get five to six hours on the average. She did not, however, ever get a full eight hours of sleep.

Turner and Hultgren were stationed at the North 3rd facility and both testified that they got little or no sleep at this home. In Hultgren's case, of her twelve overnights she averaged zero to three hours of sleep per night and was interrupted five to six times per night. These interruptions consisted of "Michelle" getting up to go to the kitchen or living room and turning on

the stereo at night. "Michelle" also would occasionally get into other client's rooms and physically attack them. Most of the latter interruptions were time for which Hultgren was compensated since she had to be up and it took some time to settle the clients down and get them back to their rooms. "Marlene" was occasionally up in the hallway asking if it was time to get up.

Turner was at the North 3rd facility only twice and stated that he was unable to sleep at all these nights but was able to document and be paid for only one hour between the two nights. The first night "Michelle" threw a tantrum and it took time to settle her down. Then "Rose" began itching badly and had to take a bath to calm the itch. The second night was calmer but Turner stated that he was very nervous because of "Michelle" particularly since she tended to be violent and because the house was unfamiliar to him, having been there only one other night.

Turner testified that at the Cleveland Street facility he was routinely interrupted by "Henry" going to the kitchen several times per night. Turner would have to get up two to three times to turn "Henry" around and send him back to his room only to have him return a short time later. All of these incidents were of a duration of less than ten minutes and were not compensated. During at least one-third to one-half of the times Turner was at this house "Jerry" was up to the bathroom and woke him, due to the client "banging" his way to and from the rooms. On one of every four to five nights "Grant" would get up prior to 5:30 A.M., get fully dressed and wander up and down the halls asking if it was time to get up. Turner estimated that there was an average of seven to eight interruptions each time he was at the Cleveland Street home and that he averaged three to four hours of sleep per night.

At the 39th Street facility, Turner slept in the living room since there was no separate staff bedroom. He was at this facility some twenty overnights and averaged three to four hours of total sleep per night. "Joe" interrupted Turner's sleep two to three times per night on half of the nights he was there by getting up to the bathroom, standing over the plaintiff "watching" him sleep or just standing in the hall at the bathroom door. None on these interrupts was compensated due to the short duration. "Mark," who loudly slammed doors when going to and from the bathroom, interrupted Turner's sleep two times per night every night Turner was at the 39th Street home. "Matt" also would be up at least once per night and was also loud when going to and from the bathroom. None of these interruptions was compensated.

At the Joyce Street facility, Turner, who was there two nights, was able to sleep through the night as were the clients at the home. This house had a staff bedroom available to the plaintiff that had an adjoining shower room and the clients were at the other end of the house. All of these clients slept through the night and often into the daytime hours also.

Smith worked overnights at the Berkshire Apartments three nights and did not get a full nights sleep any of the nights. At the apartment in which she slept, "Mark" would stay up late watching television in the living where the plaintiff had to sleep. The sleep interruptions due to this noise were not claimed as compensable because, as Smith testified, she believed that "Mark" had the right to watch television in his own home and because she was not required to "attend" to him in any way. Smith was also required to answer the phone after sleep time began, in order to receive calls from clients in the other apartments who were required to call the staff person when they came in late at night. Smith stated that she got "little sleep" at the Berkshire facility and "some nights not at all" because she was uncomfortable with the sleeping arrangements and was kept awake by the television.

Finally, Hultgren stayed one overnight at a private home which housed a client on North 14th. She was required to sleep on the living room couch in this house. Although the client did not interrupt her sleep, Hultgren testified that she did not

sleep soundly because of the lack of familiarity with the facility.

## DISCUSSION

At nearly all of the group homes described by the plaintiffs the behavior and propensities of the clients required a staff person to sleep "with one eye and one ear open." The evidence is uncontroverted that the plaintiffs' primary responsibility was the safety and well-being of the clients at the group homes. At night they were required to be prepared and alert for emergencies such as client illnesses, clients being up and moving around and, in some cases, clients attempting to leave the home. Indeed the plaintiffs' understanding of their job duties is supported by the language in the "employment agreement" at issue in this case which explicitly states:

> ... the Employer's premises is to be used primarily as a residence for persons with mental retardation. It is therefore *imperative* that the Employer's premises be attended by a person qualified and approved by LOMR when a person with mental retardation is upon the premises (or is scheduled to be upon such premises)....

(Exhibits 2, 3, 4, and 5) (Emphasis added). It may logically be inferred from this language that LOMR recognizes that their clients need attention and supervision from a qualified staff person. It is not logical to assume that a staff person on an overnight stay would be able to attend to the clients if he or she slept so soundly as to be unaware of the clients' activities or needs. While there is no evidence in this case of any disciplinary action being taken against these plaintiffs or other HSIAs for a failure to become aware of an incident or emergency, it can be inferred from the evidence that LOMR would not continue to employ staff whose inattention jeopardized the safety and health of individual clients or the group home as a whole, and I so find. The alarms on clients doors and windows also demonstrate the necessity for staff attentiveness in these group homes. In short, it is clear that LOMR requires overnight staff to be alert to client movements and activities in the night.

In many cases the plaintiffs' sleep was interrupted on brief but numerous occasions on an overnight shift. Many of these clients, albeit unintentionally, were loud and disruptive when they arose at night simply to make a bathroom visit, and even these routine night activities woke the plaintiffs. Often these activities were uneventful, but the plaintiffs, while remaining in bed, were required to listen for the client activities in the bathroom and be certain that the client was returning to his or her room within a reasonable amount of time. These interruptions were not compensated because the plaintiffs did not have to attend to the client and the time was generally less than ten minutes.

On other occasions the plaintiffs were required to get out of bed to check on a client's activities, if the bathroom visit was taking too long, or if it was clear from listening that a client had not returned to his or her room upon leaving the bathroom. The evidence amply demonstrates that many times the interruptions which required the plaintiffs to get up involved merely taking the client back to his room or directing him to go back to bed. Even when a plaintiff was required to attend to a client, if the "call to duty" was of a duration of less than ten minutes it was uncompensated. The evidence shows that on numerous occasions the plaintiffs were required to get out of bed and be up for less than ten minutes and were not compensated for the interruptions.

These uncompensated interruptions were not rare occurrences. In fact, the evidence shows that they were frequent during each night and consistent over the course of the plaintiffs' employment. The majority of the group homes described by the plaintiffs had as many five clients, most of whom were up at night on more than one occasion and often several times. In fact, the evidence shows that a client who did not get up at night was the exception rather than the rule. Whether or not the plaintiffs had to get out of bed to attend to a client does not alter the fact that numerous interruptions occurred on the majority of nights which required the plaintiffs to awaken and

be alert to the activities of a client or clients. Such interruptions made several hours of *uninterrupted* sleep impossible for the plaintiffs.

The defendants presented testimony from two residential managers which conflicted to some degree with the plaintiffs' testimony as to the frequency of nighttime interruptions at the Starr Street facility and the Ridgeview facility. Nel Kotschwar had been the residential manager at the Starr Street facility from July 7, 1980 to the time if trial. She testified that her sleep was seldom interrupted by the three female clients at the facility and at the maximum was interrupted two or three times per month. In addition she stated that she generally received seven and one-half hours of sleep per night and never less than four. On cross examination, the witness admitted that the clients were more comfortable around her and did act "differently" toward strangers.

Hultgren's testimony relating to the Starr Street facility indicates that her sleep interruptions were less frequent at that facility and that ninety per cent of the time she was able to get five and six hours of sleep per night. She was generally interrupted once per night with a client going to and from the bathroom and was interrupted every weekend by one of the clients who talked loudly in her sleep. Two or three of Hultgren's overnights were interrupted by a client who was afraid of a thunderstorm and needed comfort. Ms. Kotschwar testified that the client was "not particularly" afraid of lightening and thunder.

Leonard Brewer, residential manager for the Ridgeview facility, testified for the defendant and stated that his sleep was generally interrupted two or three times per week and only for two to three minutes each time. He also testified that on two different occasions a client had seizures which required his attention for a longer period of time. The witness indicated that he averaged seven to seven and one-half hours of sleep per night and never as little as four. Brewer's testimony corroborated Turner's and Smith's description of the clients at that facility as well as the diffi-

culties experienced with each client, but contrasted with their testimony, detailed earlier, as to sleep interruptions. He admitted on cross examination, however, that the clients knew him well due to the amount of time he spent with them, and that they were comfortable with him.

Despite the conflict in testimony as to the number of nightly interruptions and average amount of sleep time, I do not believe that it is a reflection on the plaintiffs' credibility. The testimony indicates and it is reasonable to infer that these clients were far more likely to rest better and be more at ease when the residential managers were at the homes. Testimony from residential managers who reside at these facilities for extended periods of time and are familiar with the clients is not easily equated with testimony from relief staff who do not have the luxury of knowing the clients as well or having the clients become comfortable with their presence. Undoubtedly there is comfort in familiarity, and I do not believe that the testimony of these residential managers detracts from the plaintiffs' descriptions of interruptions and disturbances they encountered as relief staff. In addition, the plaintiffs testified that there are a few occasions on which they were uncomfortable at the homes and got little sleep even without client interruptions, such as with Hultgren at the North 14th Street. It must be remembered that the residential managers who testified had slept at the same facility for many years while these plaintiffs moved from facility to facility for one or two overnights. Indeed, the notion that there is comfort in familiarity is true for the plaintiffs as well. Again, this is but one of the negative aspects inherent in their jobs which tends to decrease the chances that the plaintiffs might usually enjoy an uninterrupted night's sleep.

The sleeping facilities provided by LOMR for the plaintiffs varied from house to house. Many of the group homes had staff bedrooms which were normally used by the residential managers when they were at the facility. These rooms were available to the plaintiffs if they were the only staff person at the home on an overnight. Be-

sides the bedrooms provided, LOMR also provided couch hide-a-beds located in the living rooms at some of the homes or simply a standard couch in others. The plaintiffs testified that they often slept on the couch or hide-a-bed in the living room even if they had the option of the staff bedroom. The plaintiffs' choice of where to sleep was dictated by the particular group home at which they were staying and such factors as whether they had clients that tended to try to sneak away at night (making the living room the most logical place to sleep for prevention purposes), the cleanliness of the staff bedroom, or the location of the staff bedroom and the noise level coming from client bedrooms.

## APPLICATION OF THE LAW

The crucial question to be answered by this court is whether the plaintiffs' "sleep time" constitutes "working time" within the FLSA and as such must be included in determining whether the plaintiffs are entitled to overtime compensation. As noted in a recent case on this very question, "[i]t is well settled that under appropriate circumstances sleep time constitutes work time." *Beaston v. Scotland School for Veterans' Children*, 693 F.Supp. 234, 236 (M.D.Pa. 1988). *See, Armour & Co. v. Wantock*, 323 U.S. 126, 65 S.Ct. 165, 89 L.Ed. 118 (1944); *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944).

It is also well settled that the question of whether sleep time constitutes working time is a question of fact for the trial court. *Skidmore, supra* at 136–37, 65 S.Ct. at 162–63. *See also, Central Missouri Tel. Co. v. Conwell*, 170 F.2d 641, 646 (8th Cir.1948). The factors to be considered by the trial court in resolving this factual question were described as follows:

This involves scrutiny and construction of the agreements between the particular parties, appraisal of their practical construction of the working agreement by conduct, consideration of the nature of

the service, and its relation to the waiting time, and all of the surrounding circumstances. Facts may show that the employee was engaged to wait, or they may show that he waited to be engaged. * * * The law does not impose an arrangement upon the parties. It imposes upon the courts the task of finding what the arrangement was.

*Skidmore, supra*, 323 U.S. at 137, 65 S.Ct. at 163. In addition, the Court in *Armour* noted the importance of determining whether the "waiting time" was spent for the benefit of the employer or the employee.

[A]n employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen. Refraining from other activity often is a factor of instant readiness to serve, and idleness plays a part in all employments in a stand-by capacity. Readiness to serve may be hired, quite as much as service itself, and time spent lying in wait for threats to the safety of the employer's property may be treated by the parties as a benefit to the employer. Whether time is spent predominately for the employer's benefit or for the employee's is a question dependent upon all the circumstances of the case.

*Armour, supra*, 323 U.S. at 133, 65 S.Ct. at 168.

In FLSA cases the courts are assisted by interpretive bulletins issued by the Administrator of the Wage and Hour Division of the United States Department of Labor. These bulletins are not binding on the courts but do offer guidance in the form of "specialized experience" and "informed judgments." *Skidmore, supra* 323 U.S. at 139–40, 65 S.Ct. at 164; *Beaston, supra*, at 237. Specifically, the Administrator's "sleep time" policy is explained in the Interpretive Bulletin on Hours Worked found at 29 C.F.R. Part 785 (1988). The relevant sections are set out in the margin.[1]

---

1. § 785.21 Less Than 24–Hour Duty
   An employee who is required to be on duty for less than 24 hours is working even though he is permitted to sleep or engage in other personal activities when not busy. A tele-phone operator, for example, who is required to be on duty for specified hours is working even though she is permitted to sleep when not busy answering calls. It makes no difference that she is furnished facilities for sleep-

Although the evidence shows that many of the overnights worked by the plaintiffs were part of a shift of less than 24 hours, the defendant contends that § 785.21 is inapplicable because in reality their HSIAs were always "scheduled" for 24–hour shifts whether they were at the group home or not. The defendants assert that the 24–hour shift was made up of duty hours, sleep time and "off-duty" or so called "on call" time during which the HSIA may be called back to the group home for emergencies. The example given in testimony at trial was that an HSIA may begin a shift at 2:45 P.M. on 4/15/86, be on duty until 11:00 P.M. at which time they "clock out" for sleep time, clock back in on the morning of 4/16/86 at 7:00 A.M. and be on duty until 8:30 A.M., then leave the facility and be "off-duty" but "on call" until 2:45 P.M. the afternoon of 4/16/86. (Exhibit 16) During that "on call" time the employee is not being paid, leaves the group home and is free to do whatever he or she wishes. Frank Faughn, former business director of LOMR and present interim executive director, testified that this 24–hour shift interpretation was based on an opinion letter from the deputy administrator of the Wage and Hour Division of the Department of Labor (Exhibit 1(a)) which LOMR apparently received from Region V Mental Retardation Services located in Nebraska. In that letter the deputy administrator stated, in pertinent part, as follows:

Your third and final question related to *employees who do not reside at the community residences but who,* as relief employees, *remain there for at least 24 hours, and often as long as two or three days.* You have informed us that these relief employees, *during a 24 hour period, have off-duty time during the day with complete freedom from all responsibilities,* thereby enabling them to use the time effectively for their own purposes. Such employees, as you have pointed out, *are arguably on duty for less than 24 hours.* Your specific question is whether the sleep time of such employees can be deducted from working time.

*Under the particular circumstances you have described, we believe that such sleep time can be deducted from hours worked, provided that the employer and employees agree in advance to do so, and that no more than 8 hours per night (or actual, uninterrupted sleeptime, if that is less than 8 hours) is deducted.* We have reached this conclusion, which represents a departure from the general rule under 29 CFR 785.21, because of the home-like environment afforded to these employees in community residences, with private quarters and other amenities. * * *

ing. Her time is given to her employer. She is required to be on duty and the time is work time.

§ 785.22 Duty of 24 Hours or More

(a) *General.* Where an employee is required to be on duty for 24 hours or more, the employer and the employee may agree to exclude bona fide meal periods and a bona fide regularly scheduled sleeping period of not more than 8 hours from hours worked, provided adequate sleeping facilities are furnished by the employer and the employee can usually enjoy an uninterrupted night's sleep. If the sleeping period is of more than 8 hours, only 8 hours will be credited.

Where no express or implied agreement to the contrary is present, the 8 hours of sleeping time and lunch periods constitute hours worked.

(b) *Interruptions of sleep.* If the sleeping period is interrupted by a call to duty, the interruption must be counted as hours worked. If the period is interrupted to such an extent that the employee cannot get a reasonable night's sleep, the entire period must be counted. For enforcement purposes, the Divisions have adopted the rule that if the employee cannot get at least 5 hours' sleep during the scheduled period the entire time is working time.

§ 785.23 Employees residing on employer's premises or working at home.

An employee who resides on his employer's premises on a permanent basis or for extended periods of time is not considered as working all the time he is on the premises. Ordinarily, he may engage in normal private pursuits and thus have enough time for eating, sleeping, entertaining, and other periods of complete freedom from all duties when he may leave the premises for purposes of his own. It is, of course, difficult to determine the exact hours worked under the circumstances and any reasonable agreement of the parties which takes into consideration all of the pertinent facts will be accepted. * * *

(Exhibit 1(a), p. 4) (Emphasis in original). Faughn also testified that HSIAs had knowledge of the "24–hour shift" policy by means of the "employment agreements" such as that signed by each plaintiff, (Exhibits 2 through 5) and the monthly schedules (Exhibit 20) posted at each facility. Beginning in June 1986, these schedules indicated that overnight staff were scheduled for "full shifts"; as of August 1986 they included the following:

> All staff scheduled for overnights are scheduled for 24 hour shifts, which may include duty, evening and off duty hours. Off duty hours are not shown on the schedule and the employee is relieved from performing required duties and may engage in normal private pursuits.

In February 1988 that notice was changed to read:

> All staff scheduled for overnights must be scheduled for 24 hour shifts, which may include duty, evening, and off duty hours. Exceptions must be approved by the Coordinator. Off duty hours must not be greater than 4 per 24 hour shift and evening hours must not be more than 8 per 24 hour shift.

(Exhibit 20, February 1988 schedule).

The plaintiffs all testified that they were not aware that they were "on call" after they left a group home where they had been on duty. Indeed, each plaintiff testified that he or she generally went home and slept for several hours at the end of a shift. There is no evidence that any of the plaintiffs were called back to a facility during the alleged "on call" time period, nor is there evidence that the plaintiffs were required to leave phone numbers where they could be reached if LOMR needed to call them.

It is my conclusion that the defendant's position of the inapplicability of § 785.21 was incorrect. The circumstances of this case do not appear to fall within the scope of the "particular circumstances" set forth in the opinion letter referred to above. For those occasions that plaintiffs were required to be on the defendant's premises for less than 24–hour periods neither the "employment agreements," nor the sched-

ules, nor the actions of the parties establish that these plaintiffs were "on call" after they left their group homes when duty hours ended.

■ Even if it is assumed that the defendant was correct in not applying § 785.21 to its HSIA employees, I cannot conclude that this necessarily leads to a judgment for the defendant. The validity of Wage and Hour's position on shifts of less than 24 hours has been called into question, specifically in *Beaston v. Scotland School for Veterans' Children*, 693 F.Supp. at 238. Under the facts of this case, even under the standard set forth in § 785.22, which the defendant argues applies to the class of employees to which the plaintiffs belong, the plaintiffs are entitled to be compensated for "sleep time," because it was working time within the meaning of the FLSA.

Under § 785.22, an employer and employee may *agree* to exclude up to eight hours sleep time in a 24–hour shift *"provided* adequate sleeping facilities are furnished by the employer *and* the employee can usually enjoy an uninterrupted night's sleep."

The defendant asserts that pursuant to the "Employment Agreement" signed by each of the plaintiffs (Exhibits 2–5) it may properly deduct the sleep time at issue in this case as set forth in § 785.22. I cannot agree. First, the contracts signed by the plaintiffs were an absolute condition of continued employment for the plaintiffs, and were drafted exclusively by the defendant with no input or negotiation from the plaintiffs or any bargaining agent for them. It appears that even the Wage and Hour Division opinion letters allegedly relied upon by the defendant did not contemplate such a one-sided contract to resolve the problem of sleep time compensation. In an August 20, 1985 opinion letter from the deputy administrator he stated:

> [I]t is our opinion that ... the employer and a relief employee who performs essentially the same duties as such full time employees may agree, in advance of the performance of any work, that sleeping time of up to eight hours can be

excluded from compensable hours of work, regardless of the length of the tour of duty involved. Also, a *mutually agreed-upon* amount of off-duty time, during which the employee is completely free from all responsibilities, can be excluded from compensable hours of work. *These exclusions must be the result of an employer-employee agreement and not a unilateral decision by the employer.* Such an agreement should normally be in writing in order to preclude any possible misunderstanding of the terms and conditions of an individual's employment.

(Exhibit 1B, p. 2) (Emphasis added). The evidence is uncontradicted that the contracts at issue in this case were most certainly presented on a take-it or leave-it basis without any possibility for negotiation by the plaintiffs.

In addition, nowhere in the "Employment Agreement" does the defendant explicitly state that sleep time shall be uncompensated. The nearest the agreement comes to stating that sleep time was not to be compensated is by negative implication. The agreement states that "Duty Hours" are hours "for which the EMPLOYEE is to be paid." (Exhibits 2–5, ¶ 2.c.) By contrast, the paragraph relating to "Evening Hours," the time period during which the employee takes regular sleeping hours, makes no mention of payment or non-payment. (Exhibits 2–5, ¶ 2.d.) In Nebraska it has long been the rule that a contract will be construed most strongly against the party preparing it when there is a question as to its meaning. *Kreikemeier v. McIntosh*, 223 Neb. 551, 391 N.W.2d 563 (1986). Assuming, without deciding, that the agreements are binding on the parties, the proviso set forth in § 785.22 contemplates that even in the case of such agreements the employer must provide (1) adequate sleeping facilities *and* (2) the employee must "usually enjoy an *uninterrupted* night's sleep." The second of these conditions is not present in this case.[2]

These plaintiffs did not usually enjoy an uninterrupted night's sleep. Regardless of

---

**2.** There is doubt whether the first condition is present, as well. The defendant points out that nowhere in the interpretive bulletins or in the FLSA are "adequate sleeping facilities" defined, and that generally the facilities provided for HSIAs were "adequate" within the common meaning of that word. Although it is true that there is no definition of "adequate sleeping facilities," that within the 1981 opinion letter upon which the defendants relied and which allegedly established the guide for deductions of eight hours sleep time for relief employees, the opinion given was specifically grounded on the fact that a "home-like environment [was] afforded to these employees in community residence, with private quarters and other amenities." (Exhibit 1A, p. 4) In the 1985 opinion letter it was stated:

> As we indicated in our earlier letter, these special rules for relief employees of community residences apply *only* where the facilities offered by their employer provide a home-like environment, *with private quarters separate from the residents of the home,* thus enabling the employee to get a full night's sleep.

(Exhibit 1B, p. 3) (Emphasis added). There is some question whether "adequate sleeping facilities" within the meaning of § 785.22 is the equivalent of the "home-like environment with private quarters" referred to in the opinion letters. The defendant asserts that the "home-like environment" requirement applies only to residential managers whose job descriptions fall within § 785.23 because they "reside on the premises." It is argued that HSIAs, whose status as a relief employee places them within the purview of only § 785.22, need only be provided "adequate" sleeping facilities as set forth in that section. The defendant asserts that its interpretation is supported by a Department of Labor Wage and Hour Division Memorandum dated June 30, 1988 (Exhibit 1D), after the complaint in this case was filed, and by the fact that § 785.22 specifically refers to "adequate sleeping facilities" and § 785.23 is silent as to the sleeping facilities required.

The opinion letters from the Wage and Hour division, however, have consistently stated that if relief employees are to have sleep time deducted in the same manner as residential managers, the facilities must be of the same nature and condition. The opinions set forth in these letters are premised on the fact that relief workers were provided a "home-like environment with private quarters." (Exhibits 1A, 1B, and 1D).

The necessity and import of the "home-like environment" is not based on mere appearances or aesthetics; the importance of this issue lies in whether that environment provides "ample facilities to enable [the worker] to get a "full night's sleep." (Exhibit 1A, p. 4). As noted above, the 1985 opinion letter stated that the "special rules for relief employees ... apply only where ... the facilities ... provide a home-like environment, with private quarters ... *thus enabling the employee to get a full night's sleep.*" (Exhibit 1B, p. 3).

whether these plaintiffs slept in the staff bedrooms provided, or on the hide-a-beds or couches in the living rooms, the evidence demonstrates that their sleep was frequently interrupted by both compensated and uncompensated "calls to duty." The uncompensated interruptions may have been for routine bathroom visits by clients when the plaintiffs found it unnecessary to get out of bed or may have been midnight kitchen raids by clients when the plaintiffs were required to be up only briefly to direct the client back to bed; in either case the plaintiffs' jobs required that they be alert to and aware of the clients' movements and actions. To do so they had to be awake. There is no evidence from the defendant which contradicted the plaintiffs' descriptions of their job responsibilities, and their descriptions were consistent with the defendant's official job description for HSIAs. Thus, the very nature of the plaintiffs' jobs required that they be ready for frequent nighttime interruptions if the clients at the group home at which they worked were prone to getting up at night. The evidence in this case shows that as a general rule the clients described by the plaintiffs were prone to being up at night, often frequently, and on a consistent basis over time.

Finally, if analyzed under the test set forth in *Armour*, the evidence clearly establishes that the overnights spent at group homes by the plaintiffs constituted time spent for the benefit of the defendant, not the plaintiffs. The evidence does show that these plaintiffs occasionally received extra paid hours at night if a client was awake for an extended period of time and required the attention of the staff. Aside from that potential benefit, however, there is no evidence and the defendant does not argue that the time spent was to the benefit of the plaintiffs. The defendant requires, for good reason, that a qualified staff person be at the group homes anytime a client is on the premises. Such time spent by the plaintiffs on overnight shifts is in furtherance of the defendant's service of providing care to its clients, and thus is to the benefit of the defendant.

As mentioned above, the defendant asserts that the *Beaston* case is directly on point and requires this court to conclude that this action must fail. I cannot agree. The facts of *Beaston* are not similar to this case in several respects. The plaintiff houseparents in *Beaston* slept exclusively in private bedrooms with their own private baths, and the noises complained of were found to be "not unlike those in many homes in many communities" such as "the heating system, passing trains and security guards." *Beaston, supra* at 238. The most significant difference, however, is that the persons being supervised in *Beaston* were not individuals with the mental and physical handicaps described by the plaintiffs in this action, and they did not require the special needs and attention of the clients in this case. In short, the interruptions found in this case were not present in *Beaston*, a fact which clearly distinguishes that case.

In *Central Missouri Tel. Co. v. Conwell, supra*, the Eighth Circuit held that telephone operators who were required to remain on the employer's premises and be accessible to the switchboard for calls must be paid for the "sleep time" allotted during an eleven hour shift. The operators were required to work eleven hour shifts, 9:00 P.M. until 8:00 A.M., but had been paid for only eight hours because they were allowed to rest or sleep for portions of the night when the switchboard slowed down. The evidence showed that on some nights the plaintiffs got several hours of sleep and on other nights received very little sleep due to frequent interruptions. The court held that the entire eleven hour shift must be considered work time because it was clear that "they were required to be in the exchange ready to serve" and "were not there for the purpose of sleep nor for any purpose of their own, but for their employer's benefit." *Central Missouri Tel. Co., supra*, at 646.

The defendant points out that the Eighth Circuit has, however, considered sleep time as non-compensable under the FLSA in *Rokey v. Day & Zimmermann*, 157 F.2d 734 (8th Cir.1946), *cert. denied*, 330 U.S. 842, 67 S.Ct. 1082, 91 L.Ed. 1288 (1947). In

*Rokey* the employees were firemen at an ordnance plant who were required to be on duty for 24 consecutive hours on alternate days and were paid for sixteen of those hours, 8:00 A.M. to midnight, then had sleep time allotted for the remaining eight hours of their shift. If the firemen were "called to duty" during the sleep hours they were compensated for that time. However, the *Rokey* case is easily distinguishable; the court specifically found that those firemen were able to get "ample consecutive hours of sleep" and the calls to duty were "occasional but infrequent." *Id.* at 737. In fact, the interruptions "averaged less than one call per three months" and "varied from thirteen in about two years for one of the plaintiffs, to no calls whatever in six months for another." *Id.* at 736. Clearly there is no similarity in the nature and frequency of the interruptions between this case and *Rokey.* Indeed, in *Central Missouri* the Eighth Circuit distinguished the *Rokey* case for the same reason: the difference in the frequency of interruptions. *Central Missouri, supra* at 646.

Not only is this case more like *Central Missouri* than *Rokey;* it is even stronger than *Central Missouri* for the plaintiffs' position. In *Central Missouri* the plaintiffs' sleep time was a period of no great responsibility; that is, so long as the switchboard alarm did not sound, the operators could be confident that they were free to sleep restfully with the assurance that the switchboards' calls would awaken them if necessary. In contrast, the plaintiffs in this case were required by their responsibilities to be alert to clients' actions at all times, including sleep time; plaintiffs had no external means (except the alarms which were sometimes circumvented) by which to be notified of clients' silent or quiet movements, and had to, therefore, remain semi-conscious or awake to be alert for indications of such activities. This fact, in addition to the frequent noisy interruptions of sleep described above, further compels the conclusion that these plaintiffs were not usually able to enjoy an uninterrupted night's sleep while adequately meeting the responsibilities of their posi-

tions. Although the defendant required them to "clock out" on their time cards, they could not "clock out" in their minds and still carry out their responsibilities.

## GOOD FAITH DEFENSE

■ The defendant asserts that even if this court finds that it violated the provisions of FLSA it is entitled to a good faith defense pursuant to 29 U.S.C. § 259, the Portal to Portal Act (hereafter PTPA). For the reasons that follow I conclude that this defense must fail.

Section 259(a) of the PTPA states, in pertinent part, as follows:

(a) In any action or proceeding based on any act or omission on or after May 14, 1947, no employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay minimum wages or overtime compensation under the [FLSA] ... if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of the agency of the United States specified in subsection (b) of this section, or any administrative practice or enforcement policy of such agency with respect to the class of employers to he which belonged. Such a defense, if established, shall be a bar to the action or proceeding, notwithstanding that after such act or omission, such administrative regulation, order, ruling, approval, interpretation, practice, or enforcement policy is modified or rescinded or is determined by judicial authority to be invalid or of no legal effect.

(b) The agency referred in subsection (a) of this section shall be—

(1) In the case of the Fair Labor Standards Act of 1938, as amended, the Administrator of the Wage and Hour Division of the Department of Labor;

\* \* \* \* \* \*

Brian Lensch testified that the defendant's non-payment for sleep time policy was based largely on two opinion letters from the deputy administrator of the Wage

and Hour Division (Exhibits 1A and 1B) as well as Interpretive Bulletin, Part 785 (Exhibit 1E). The defendant's belief that § 785.21, referring to shifts of less than 24 hours, did not apply to HSIAs was based specifically on the two opinion letters referred to above.

These letters are insufficient to support a finding that the defendant acted "in good faith in conformity and in reliance on any administrative, regulation, order, ruling, approval or interpretation ..." due to the fact that these documents were not issued by the "Administrator" of the Wage and Hour Division as required by § 259(b) cited above. Such statements as those found in the opinion letters relied upon by the defendant which emanate from lesser officials or employees are not sufficient to support the good faith reliance referred to in § 259. *See, National Automatic Laundry and Cleaning Council v. Shultz*, 443 F.2d 689, 700 (D.C.Cir.1971); 29 C.F.R. § 790.13.

Even assuming that these opinion letters would suffice as documents upon which the defendant could rely, under the objective test required of § 259, *See*, 29 C.F.R. 790.-15(a); *Clifton D. Mayhew, Inc. v. Wirtz*, 413 F.2d 658 (4th Cir.1969), the evidence is insufficient to show that the defendant's acts were consistent with those of a "reasonably prudent" person under similar circumstances.

The issue of good faith is a question of fact and all the facts and background must be reviewed. *Martinez v. Phillips Petroleum Co.*, 283 F.Supp. 514 (D.C.Idaho 1968), *aff'd*, 424 F.2d 547 (9th Cir.1970). The evidence in this case shows that the defendant read and interpreted the opinion letters of 1981 and 1985 selectively and took certain portions of those letters out of context, resulting in a belief most favorable to the county. The fact that the letters state that the "special rules" for relief employees apply only if a home-like environment is provided but the defendant continues to assert that HSIAs need only be provided with "adequate sleeping facilities," a lesser standard in the defendant's view, is but one example. Secondly, the opinion letters explicitly recommend that the agreement regarding the exclusion of sleep time be a mutual agreement, and not the "unilateral decision of the employer." (Exhibit 1B). Finally, and most importantly, the defendant's application of the "special rule" allowing relief employees such as the plaintiffs to be classified under § 785.22 instead of § 785.21 could only be accomplished by what appears to be a quick manipulation of reality which turned "off-duty" hours into alleged "on-call" hours such that the plaintiffs could be considered as working 24–hour shifts. As I pointed out above, it is unnecessary for me to decide whether § 785.21 is a correct interpretation of the FLSA. However, the defendant did not assume that this section was incorrect; it simply altered its characterization of the facts to avoid the effect of that section. The opinion letter indicates that the "special rule" applies for relief employees that "remain [at the home] for at least 24 hours" but have "time during the day with complete freedom from all responsibilities...." (Exhibit 1A, p. 4). These plaintiffs did not generally remain at the group homes for at least 24 hours and could only be said to fall into such a classification through the use of the "on-call" sleight of hand.

Another indication which supports a finding that these alleged 24–hour shifts were more fantasy than reality can be found in a LOMR memorandum to its residential managers concerning scheduling substitutes for overnight shifts. The following "alternatives" were given as examples for solving the problem of substitutes that cannot work an entire 24 hour shift but will be doing an overnight:

(1) If the schedule is 24 hours and the clients are home the whole time, the shift could be split with one substitute working 20 hours (with 4 hours off duty) and a second substitute covering the other 4 hours.

(2) If the shift is more than 24 hours, the shift can be split with the overnight person working a 24 hour shift (which can include up to four hours off duty time) and a second substitute covering the remainder of the shift. For example: if the shift is Friday 3 pm to Saturday at 10

pm, then the substitute could work Friday 3 pm to Saturday at 11 am (with 11 am to 3 pm off duty hours) and a second substitute could work Saturday (11 am to 10 pm).

(Exhibit 13, p. 1). As can be seen from these examples, there is no indication that the first substitutes are "on call." They are, instead, regarded as "off duty," and there is no evidence that they were to arrange a way for the defendant to contact them during the "off-duty" hours. The "off-duty" hours of the first substitutes are clearly being covered by second substitutes. I conclude that the "on call" status of these plaintiffs was purely a fiction created by the defendant to avoid the effect of § 785.21.

Further, the manner in which the former director, as agent of the defendant, interpreted the five hour minimum sleep requirement, such that the five hours need not be "consecutive" hours of sleep is also indicative of a lack of good faith. This position is completely unreasonable and unsupported by any documents from Wage and Hour or any other agency. A requirement of at least five hours of uninterrupted sleep must mean consecutive hours, or it has no meaning at all.

In addition, I cannot say that the ten minute "call to duty" policy of the defendant was a reasonable interpretation of the provisions of the FLSA. Indeed, in the *Beaston* case, upon which the defendant relies heavily, the employer's "call to duty" policy was stated by the court as follows:

> The houseparents are compensated for fifteen minutes of work for every fraction of a quarter hour actually spent working. For example, if they work for five minutes, they may claim fifteen minutes, if they work for sixteen minutes, they may claim thirty minutes, etc.

*Beaston, supra,* at 236, n. 2. By contrast, the plaintiffs in this situation were required to work at least ten minutes before they were able to receive any compensation even though their sleep was still interrupted.

Under all of the circumstances of this case, I cannot say that the acts or omissions of the defendant were undertaken in good faith when analyzed under an objective test of reasonableness. Thus the provisions of the Portal to Portal Act cited by the defendant provide no defense to the plaintiffs' claims for back wages.

## LIQUIDATED DAMAGES

■ The plaintiffs seek unpaid compensation and "an additional equal amount as liquidated damages" pursuant to 29 U.S.C. § 216(b) which directs that an employer who violates the minimum wage or overtime provisions "shall be liable ... in the amount of ... their unpaid overtime compensation, and in an additional equal amount as liquidated damages." However, the mandatory nature of § 216 is tempered by § 260 of the Portal to Portal Act which permits an employer to assert a good faith defense to § 216's liquidated damages provision. Pursuant to § 260, the court may in its discretion award such liquidated damages unless the employer can show "that the act or omission giving rise to [the] action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA]." 29 U.S.C. § 260. The liquidated damages contemplated by § 216 are intended to be compensatory rather than punitive, *E.E.O.C. v. First Citizens Bank of Billings,* 758 F.2d 397, 402–03, *cert. denied,* 474 U.S. 902, 106 S.Ct. 228, 88 L.Ed.2d 228 (1985).

■ The good faith defense embodied in § 260 contemplates a two-part test. As noted by the Tenth Circuit:

> All circuits that have considered the matter hold that in order to invoke the district court's discretion under § 260, the employer has the burden of showing that he acted in good faith *and* that he had reasonable grounds for believing that he did not violate the Act. *See, Marshall v. Brunner,* 668 F.2d 748, 753 (3rd Cir. 1982); *Barcellona v. Tiffany English Pub, Inc.,* 597 F.2d 464, 468 (5th Cir. 1979); *Laffey v. Northwest Airlines, Inc.,* 567 F.2d 429, 464 (D.C.Cir.1976), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978).

*Sinclair v. Automobile Club of Oklahoma, Inc.,* 733 F.2d 726 (10th Cir.1984); *see also, Crenshaw v. Quarles Drilling Corp.,* 798 F.2d 1345, 1349 (10th Cir.1986). In contrast to the objective good faith test applicable to § 259 referred to above, the test for awarding liquidated damages incorporates both a subjective and an objective standard. *Bueno v. Mattner,* 633 F.Supp. 1446 (W.D.Mich.1986), *aff'd,* 829 F.2d 1380 (6th Cir.1987), *cert. denied,* 486 U.S. 1022, 108 S.Ct. 1994, 100 L.Ed.2d 226 (1988). The good faith test of § 260 is judged under a subjective standard while the "reasonable belief" of the employer is judged under an objective standard. *See, Bueno v. Mattner, supra; Williams v. Tri-County Growers, Inc.,* 747 F.2d 121, 129 (3rd Cir.1984); *Marshall v. Brunner,* 668 F.2d 748, 753 (3rd Cir.1982); *Laffey v. Northwest Airlines, supra,* at 465.

While case law holds that the good faith test of § 260 is based on a subjective standard, the Secretary of Labor's interpretive bulletin indicates to the contrary. 29 C.F.R. § 790.22(c) states:

> What constitutes good faith on part the part of an employer and whether he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act are mixed questions of fact and law, which should be determined by objective tests. * * *

The footnote to that regulation refers the reader back to the regulations relating to § 259; i.e. 29 C.F.R. 790.13 to 790.16. Despite this conflict on this issue, I conclude that the Secretary's interpretation is not in line with case law on this issue and I decline to adopt the Secretary's position.

In *E.E.O.C. v. First Citizens Bank of Billings, supra* the Ninth Circuit held that in order to satisfy the subjective good faith component under § 260 the employer is obligated to prove that it had "an honest intention to ascertain what [the FLSA] requires and to act in accordance with it." *First Citizens Bank of Billings, supra,* at 403.

Case law on this issue indicates that acts or omissions on advice of counsel or other professional support a finding, under a sub-jective test, that the employer acted in good faith and, objectively, will support a finding that the employer had "reasonable grounds" upon which he or she could base a belief that they were in compliance with the FLSA. For instance, in *Lane v. M's Pub, Inc.,* 435 F.Supp. 917 (D.Neb.1977), this court denied an employee's request for liquidated damages based almost exclusively on the fact that the employer had "consulted with her accountant who informed her" that her business was exempt from the provisions of the FLSA. Thus, the court held that "[w]hile her accountant was mistaken, ... [the employer] reasonably and in good faith relied on his advice." *Lane, supra,* at 920. These actions, the court held, showed that the employer "sought to ascertain the law so as to comply with it." *Id., citing, Hodgson v. Barge, Waggoner & Sumner,* 377 F.Supp. 842, 845 (M.D.Tenn.1972), *aff'd,* 477 F.2d 598 (6th Cir.1973).

In *Sinclair v. Automobile Club of Oklahoma, Inc., supra,* the court held that where an employer "offered no evidence that it investigated the requirements of the Equal Pay Act," and, thus, there was no evidence to show that it had reasonable grounds for believing that it was in compliance with the Act, liquidated damages were mandatory since the employer failed to meet its burden of proof under the second prong of the inquiry required by § 260.

Brian Lensch testified that after the *Garcia* decision was handed down he, as executive director of LOMR, "contacted the Lancaster County Attorney's Office" to ask what steps would be necessary to comply with the ruling. In addition, he sought and obtained copies of the *Garcia* opinion, the relevant Wage and Hour publications, the opinion letters (Exhibits 1A and 1B) which Region V Mental Retardation Services had previously received, and Interpretive Bulletin 785. Mr. Lensch also testified that the "Employment Agreements" signed by the plaintiffs were drafted by Pat Heng, a deputy county attorney, and were drafted for the purpose of solving the "sleep time problem." This testimony is the only indication of the advice LOMR received from

its counsel on this matter. A mere bald assertion that LOMR had "contacted the Lancaster County Attorney's office" after *Garcia* would not have been sufficient evidence to support the good faith and reasonable grounds test of § 260 because the court would have no proof of whether the defendant was acting on advice of counsel if there were no showing as to what advice was given. However, given that there is evidence that the deputy county attorney drafted the agreements signed by the plaintiffs, it is fair to infer that the defendant was acting on advice of counsel to the effect that its actions constituted a defensible position under the FLSA. This inference is based on the fact that the defendant was represented at trial by the Lancaster County Attorney's Office; if LOMR had acted of its own accord and against advice of counsel, the county attorney's office could not ethically represent the defendant in this action. I therefore conclude that the defendant made an honest effort to ascertain the requirements of the FLSA by consulting with counsel and taking other actions described. Such efforts are sufficient to establish that it was acting on a subjective good faith belief that it was in compliance with FLSA. Although the actions taken did not, in fact, comply with the FLSA, the defendant had a reasonable basis to believe—at the time the actions were implemented—that its actions complied.

However, the defendant's good faith efforts to comply and reasonable grounds for belief that they were in compliance can not be said to exist throughout the entire time period of this suit. The testimony of Brian Lensch shows that in August of 1987 the defendant became aware that their policy relating to sleep time had become the subject of an investigation by the Department of Labor. First, it should be noted that the defendant argues that the investigation related only to residential managers; however, Brian Lensch testified that the "shift workers" referred to in the letter notifying the defendant of violations (Exhibit 24) would include HSIAs. I therefore find that the Wage and Hour investigation of the defendant was intended to include the class of employees to which the plaintiffs belonged.

The evidence shows that subsequent to August of 1987 at least three meetings took place between LOMR administrators and Mr. Tesarek from the regional office of the Wage and Hour division. The investigator asked to look at employment agreements, residential associate contract's, schedules and time cards in addition to interviewing several residential managers of the group homes. Subsequent to these three meetings and a review of the documents requested, the defendant received, on November 4, 1987, a letter from James L. Skolaut, "Mr. Tesarek's supervisor," which notified it that LOMR's sleep policy of the past was incorrect and in violation of the FLSA and that "[t]he failure of LOMR to properly compensate employees for all wages legally due constitute[d] a liability for the employer." (Exhibit 24). Nonetheless, the defendant continued on its course of non-payment for sleep time until July of 1988. Indeed, the only action taken immediately after the notice of violation involved a meeting with the Lancaster County Board at which it was determined that the defendant should seek the assistance of the County's congressional representatives in an attempt to overturn the Wage and Hour ruling. In fact such a meeting did take place when a Lancaster County Board member, Lancaster County deputy county attorney, and Brian Lensch did meet with a congressional representative to discuss the possibility of overturning this ruling.

Based on this evidence, I conclude that as of November 4, 1987 the defendant did not have reasonable grounds to believe that it was in compliance with the FLSA, and in fact, at that point, had reasonable grounds for believing that its sleep time policy was violating the Act. Thus, I conclude that it is appropriate to impose liquidated damages from November 4, 1987 given that after that date there is no evidence of good faith efforts to comply or reasonable grounds to believe the defendant was in compliance.

The defendant asserts that a "moratorium" was placed on all investigations regarding sleep time at group homes as of January 4, 1988, and as of that date imposition of liquidated damages would be unfair. The evidence is insufficient, however, to establish that this "moratorium" related to the LOMR investigation. First, there is no evidence as to when the defendant in this case received a copy of the announced "moratorium." (Exhibit 1C). Second, there is insufficient evidence to prove that the "moratorium" letter (Exhibit 1C) bore any relation whatsoever to the investigation of LOMR by Mr. Tesarek. In fact, the evidence indicates that Tesarek's investigation was complete as of January 4, 1988 given the violation letter referred to above (Exhibit 24) points to such an inference when it states, "Our investigation *determined* that many nonexempt employees worked in excess of 40 hours per week and did not receive overtime pay as required by Section 7 of the law." (Exhibit 24, p. 1) (Emphasis added).

I therefore conclude that as of November 4, 1987 the defendant no longer was operating under a reasonable belief that it was in compliance with the FLSA and liquidated damages should be paid the plaintiffs from that date. The plaintiffs' damages are calculated on the attached appendices, and, following determination of attorney fees, judgment will be entered for the amounts shown, plus costs and fees.

IT THEREFORE HEREBY IS ORDERED:

Plaintiffs are hereby given 15 days from this date by which to file their application for attorney fees and expenses in accordance with 29 U.S.C. § 216(b) and the local rules of this court, together with supporting documentation. Defendant shall have 15 days thereafter in which to file its response.

## APPENDIX A
### Damage Award—Lisa Hultgren

| TIME PERIOD | PAY RATE | UNCOMPENSATED HOURS | TOTAL DUE |
|---|---|---|---|
| 4/15/86 to 8/27/86 | Regular $6.072 | At Regular Rate 38.50 Hours | $233.77 |
| | Overtime $9.108 | At Overtime Rate 166.50 Hours | $1516.48 |
| 8/28/86 to 12/17/86 | Regular $6.248 | At Regular Rate 33.75 Hours | $210.87 |
| | Overtime $9.372 | At Overtime Rate 232 Hours | $2174.30 |
| 12/18/86 to 9/2/87 | Regular $6.528 | At Regular Rate 111.25 Hours | $726.24 |
| | Overtime $9.792 | At Overtime Rate 460 Hours | $4504.32 |
| 9/3/87 to 2/18/88 | Regular $6.724 | At Regular Rate 110 Hours | $739.64 |
| | Overtime $10.086 | At Overtime Rate 336.25 Hours | $3391.41 |

TOTAL
$13,497.03

### LIQUIDATED DAMAGES
For Period 11/4/87 to 2/18/88
Regular Rate of Pay— $6.724 × 58.75 = $395.03
Overtime Rate of Pay— $10.086 × 234.50 = $2365.16
Total = $2760.19

## APPENDIX B
### Damage Award—Victoria Smith

| TIME PERIOD | PAY RATE | UNCOMPENSATED HOURS | TOTAL DUE |
|---|---|---|---|
| 4/15/86 to | Regular | At Regular Rate | $352.09 |

| TIME PERIOD | PAY RATE | UNCOMPENSATED HOURS | TOTAL DUE |
|---|---|---|---|
| 8/27/86 | $6.344 Overtime $9.516 | 55.50 Hours At Overtime Rate 172.25 Hours | $1639.13 |
| 8/28/86 to 9/2/87 | Regular $6.528 Overtime $9.792 | At Regular Rate 145.50 Hours At Overtime Rate 195.50 Hours | $949.82 $1914.33 |
| 9/3/87 to 2/18/88 | Regular $6.724 Overtime $10.086 | At Regular Rate 123.75 Hours At Overtime Rate 73.75 Hours | $832.09 $743.84 |

TOTAL
$6,431.30

## LIQUIDATED DAMAGES

For period 11/4/87 to 2/18/88

Regular Rate of Pay— $6.724 × 81.5 hours = $548.00

Overtime Rate of Pay— $10.086 × 65.75 hours = $663.15

Total = $1,211.16

---

## APPENDIX C

### Damage Award—Daniel Turner

| TIME PERIOD | PAY RATE | UNCOMPENSATED HOURS | TOTAL DUE |
|---|---|---|---|
| 4/15/86 to 8/27/86 | Regular $5.067 Overtime $7.600 | At Regular Rate 98.25 Hours At Overtime Rate 198.50 Hours | $497.83 $1508.60 |
| 8/28/86 to 2/25/87 | Regular $5.214 Overtime $7.821 | At Regular Rate 10.5 Hours At Overtime Rate 80.50 Hours | $54.74 $629.59 |
| 2/26/87 to 4/15/87 | Regular $5.462 Overtime $8.193 | At Regular Rate 0 Hours At Overtime Rate 7 Hours | $0.00 $57.35 |
| 4/16/87 to 9/2/87 | Regular $5.968 Overtime $8.952 | At Regular Rate 0 Hours At Overtime Rate 7 Hours | $0.00 $62.66 |
| 9/3/87 to 10/7/87 | Regular $6.147 Overtime $9.220 | At Regular Rate 0 Hours At Overtime Rate 20.25 Hours | $0.00 $186.70 |
| 10/8/87 to 2/18/88 | Regular $6.435 Overtime $9.652 | At Regular Rate 0 Hours At Overtime Rate 13.50 Hours | $0.00 $130.30 |

TOTAL$3127.77

## LIQUIDATED DAMAGES

For period from 11/4/87 to 2/18/88

Regular rate of pay— $6.453 × 0 hours = $0.00

Overtime rate of pay— $9.652 × 13.5 hours = $130.30

TOTAL = $130.30

---

836

APPENDIX D

<u>TOTAL DAMAGES</u>
Daniel Turner—    $3,258.07
Victoria Smith—   $7,642.46
Lisa Hultgren—    $16,257.22